# LONCHAR *v.* THOMAS, WARDEN

No. 95–5015.   Argued December 4, 1995—Decided April 1, 1996

BREYER, J., delivered the opinion of the Court, in which STEVENS, O'CONNOR, SOUTER, and GINSBURG, JJ., joined. REHNQUIST, C. J., filed an opinion concurring in the judgment, in which SCALIA, KENNEDY, and THOMAS, JJ., joined, *post*, p. 334.

*Donald B. Verrilli, Jr.,* argued the cause for petitioner. With him on the briefs were *Paul M. Smith* and *Clive A. Stafford Smith.*

*Mary Beth Westmoreland,* Senior Assistant Attorney General of Georgia, argued the cause for respondent. With her on the brief were *Michael J. Bowers,* Attorney General, and *Susan V. Boleyn,* Senior Assistant Attorney General.

JUSTICE BREYER delivered the opinion of the Court.

This case asks us to decide whether a federal court may dismiss a first federal habeas petition for general "equitable" reasons beyond those embodied in the relevant statutes, Federal Habeas Corpus Rules, and prior precedents. We decide that the Court of Appeals erred in doing so in this case. The primary "equitable" consideration favoring dismissal of the "eleventh hour" petition before us is serious delay. A Federal Habeas Corpus Rule deals specifically with delay. See 28 U. S. C. § 2254 Rule 9(a) (permitting courts to dismiss a habeas petition when "it appears that the state . . . has been prejudiced in its ability to respond . . . by delay in its filing"). And, in our view, this Rule, not some general "equitable" power to create exceptions to the Rule, should have determined whether or not the petition's dismissal was appropriate.

I

Petitioner Larry Lonchar was sentenced to death for murder nine years ago. He filed this "eleventh hour" petition

for habeas corpus—his *first* federal habeas corpus petition—
on June 28, 1995, the day of his scheduled execution. To
understand the procedural significance of this petition, the
nature of the delay here at issue, and other relevant special
features of this case, we must consider the petition in the
context of earlier proceedings, which, for ease of exposition,
we divide into five stages:

*Stage One: Trial, Appeal, Execution Date: 1987–1990.* In
1987, Lonchar was convicted in state court for murdering
three people and sentenced to death by electrocution. A
mandatory state-court appeal led to affirmance of the convic-
tion and sentence in 1988. The trial judge then issued a
death warrant for the week of March 23, 1990. Throughout
these proceedings Lonchar said he wanted to die and refused
to cooperate with his lawyer or to attend his trial. He also
attempted (unsuccessfully) to waive his mandatory appeal,
declined to authorize any collateral attacks on his conviction
or sentence, and wrote the trial judge asking for an execu-
tion date.

*Stage Two: Sister's "Next Friend" Habeas: March 1990–
February 1993.* Two days before the scheduled execution,
Lonchar's sister, Chris Kellog, filed a "next friend" habeas
petition in state court, claiming Lonchar was incompetent.
Lonchar opposed the action and eventually the state and fed-
eral courts, at trial and appellate levels, held that Lonchar
was competent and dismissed the petition. The state courts
again issued a death warrant, this time for the week of Feb-
ruary 24, 1993.

*Stage Three: Lonchar's own State Habeas: February 1993–
May 1995.* After Lonchar's lawyer told him that his
brother, Milan, was threatening to kill himself because of
Lonchar's execution, Lonchar authorized a habeas petition in
state court and obtained a stay of execution. He subse-
quently changed his mind and told the judge he did not want
to proceed. Although his lawyers objected that Lonchar
was incompetent to make this decision, the judge dismissed

the petition without prejudice. A death warrant was issued for the week of June 23, 1995.

*Stage Four: Brother's "Next Friend" Habeas: June 20– June 23, 1995.* Three days before the scheduled execution, Lonchar's brother, Milan, filed another "next friend" habeas petition in state court. Lonchar again opposed it. Within three days, Milan's petition met the same fate as his sister's earlier petition. That is to say, federal and state courts, at trial and appellate levels, all found Lonchar competent and denied the petition.

*Stage Five: Lonchar's Current Habeas: June 23, 1995– Present.* Immediately thereafter, after discussions with his lawyers, Lonchar filed another state habeas petition containing 22 claims, including one that challenged the method of execution. He told the state-court judge that he wished to pursue each of the 22 claims, but was litigating them only to delay his execution, with the hope that the State would change the execution method to lethal injection so he could donate his organs. The state courts stayed the execution briefly, and then, two days later, denied the petition. Lonchar immediately filed his first federal habeas petition, which set forth the same 22 claims.

The State asked that Lonchar's federal petition be dismissed, stressing what it called Lonchar's "inequitable conduct" in waiting almost six years, and until the last minute, to file a federal habeas petition. The District Court held that this could not constitute an independent basis for rejecting the petition. In its view, Habeas Corpus Rule 9, not some generalized equitable authority to dismiss, governed the case. And, it held, Rule 9's authority to dismiss for "abuse of the writ" applied to "second or successive" habeas petitions, not to a first petition, such as Lonchar's. See Habeas Corpus Rule 9(b) ("A *second or successive* petition may be dismissed if . . . the judge finds that the failure of the petitioner to assert those grounds *in a prior petition* constituted an abuse of the writ") (emphasis added). The District

Court therefore granted a stay to permit time for consideration of the State's other grounds in its motion to dismiss.

The next day the Court of Appeals for the Eleventh Circuit vacated the stay. 58 F. 3d 590 (1995). It pointed out that the District Court had "based its holding exclusively on Rule 9." *Id.*, at 592. It held that "equitable doctrines independent of Rule 9" applied, relying chiefly on this Court's *per curiam* order in *Gomez* v. *United States Dist. Court for Northern Dist. of Cal.*, 503 U. S. 653 (1992). 58 F. 3d, at 593. And, setting aside the Rules and traditional habeas doctrines, the court concluded that, in the circumstances of this case, "Lonchar does not merit equitable relief." *Ibid.*

As mentioned above, we granted certiorari in order to consider whether a federal court may, in such circumstances, dismiss a valid first habeas petition for "equitable reasons" other than reasons listed in federal statutes and Rules, or well established in this Court's precedents.

## II

We first discuss a preliminary matter. We have before us a Court of Appeals order that vacates a stay, not an order to dismiss the habeas petition. We believe, however, that this fact makes no difference. That is, the Court of Appeals order vacating the stay is lawful *only if* dismissal of the petition would have been lawful. By bringing about Lonchar's execution, vacating the stay would prevent the courts from considering the petition's merits, just as would its dismissal.

This Court has previously considered, in a slightly different context, whether a court may allow a first federal habeas petition to be mooted by an execution, even though the court lacked the authority to dispose of the petition on the merits. In *Barefoot* v. *Estelle*, 463 U. S. 880 (1983), the Court considered the proper standard for granting or denying a stay pending consideration of an appeal from a dismissal of a first federal habeas petition. The Court stated:

"When a certificate of probable cause is issued by the district court, as it was in this case, or later by the court of appeals, petitioner must then be afforded an opportunity to address the merits, and the court of appeals is obligated to decide the merits of the appeal. Accordingly, a court of appeals, where necessary to prevent the case from becoming moot by the petitioner's execution, should grant a stay of execution pending disposition of an appeal when a condemned prisoner obtains a certificate of probable cause on his initial habeas appeal." *Id.*, at 893–894.

We believe that the same principle applies when a district court is faced with a request for a stay in a first federal habeas case: If the district court cannot dismiss the petition on the merits before the scheduled execution, it is obligated to address the merits and must issue a stay to prevent the case from becoming moot. That is, if the district court lacks authority to directly dispose of the petition on the merits, it would abuse its discretion by attempting to achieve the same result indirectly by denying a stay. Of course, a district court is authorized to dismiss a petition summarily when "it plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court," Habeas Corpus Rule 4, just as a court of appeals is not required to address an appeal that fails to meet the certificate of probable cause standard of a "substantial showing of the denial of a federal right," see *Barefoot*, 463 U. S., at 893–894. And, as is also true of consideration of appeals, a district court may, within the constraints of due process, expedite proceedings on the merits. *Id.*, at 894–895.

In this case, Lonchar's claims certainly seem substantial enough to prevent dismissal under Rule 4, and the State does not argue to the contrary. That being so, we believe that the District Court and Court of Appeals were correct to as-

sume that Lonchar could not be denied a stay unless his petition was properly subject to dismissal. See App. 62, 63–64; 58 F. 3d, at 593.

The concurrence argues that the Court's decision in *Gomez v. United States Dist. Court for Northern Dist. of Cal., supra,* displaced the rationale of *Barefoot,* relying particularly on the statement that a "court may consider the last-minute nature of an application to stay execution in deciding whether to grant equitable relief." 503 U. S., at 654. The concurrence understands this statement to authorize denial of a stay, for generalized equitable reasons, in first federal habeas cases, even when the district court lacks authority to dismiss the petition on the merits. We do not believe this sentence, or the rest of the Court's order in *Gomez,* supports this conclusion.

First, *Gomez* did not involve denial of a stay in a case in which the lower court had no authority to dismiss the petition. Instead, as the concurrence concedes, *post,* at 338, the case could have been dismissed as an "abuse of the writ." See 503 U. S., at 653–654. Second, *Gomez* involved a *fifth* attempt to secure collateral review, not a *first* habeas petition. *Barefoot* indicated that stays in "[s]econd and successive federal habeas corpus petitions present a different issue," since in such cases it is more likely that "'a condemned inmate might attempt to use repeated petitions and appeals as a mere delaying tactic,'" and because this danger is specially recognized and addressed in the Habeas Corpus Rules. *Barefoot, supra,* at 895. Finally, the concurrence's reading of *Gomez* seriously conflicts with *Barefoot*'s well-settled treatment of first habeas petitions. We decline to adopt such a far-reaching interpretation of this *per curiam* order, especially since *Gomez* did not concern a first habeas petition, and since the *Gomez* order did not discuss (or even cite) *Barefoot,* much less explicitly repudiate its rationale.

## III

We turn, then, to the main question: Could the Court of Appeals properly dismiss this first habeas petition for special ad hoc "equitable" reasons not encompassed within the framework of Rule 9? We conclude that it could not.

First, the history of the Great Writ of Habeas Corpus reveals, not individual judges dismissing writs for ad hoc reasons, but, rather, the gradual evolution of more formal judicial, statutory, or rules-based doctrines of law. See, *e. g.*, *McCleskey* v. *Zant*, 499 U. S. 467, 479–489 (1991); *Barefoot*, *supra*, at 892; *Kuhlmann* v. *Wilson*, 477 U. S. 436, 451 (1986) (plurality opinion); *Sanders* v. *United States*, 373 U. S. 1, 15 (1963); *Townsend* v. *Sain*, 372 U. S. 293, 313 (1963). In earlier times, the courts followed comparatively simple rules, even occasionally disregarding complex procedural doctrines, such as res judicata, see *McCleskey*, *supra*, at 479, as they exercised the writ in light of its most basic purpose, avoiding serious abuses of power by a government, say a king's imprisonment of an individual without referring the matter to a court. See, *e. g.*, L. Yackle, Postconviction Remedies § 4, pp. 9–11 (1981); W. Duker, A Constitutional History of Habeas Corpus 4–6 (1980); W. Church, A Treatise on the Writ of Habeas Corpus §§ 1–46, pp. 2–40 (2d ed. 1893). As the writ has evolved into an instrument that now demands not only conviction by a court of competent jurisdiction, see *In re Coy*, 127 U. S. 731, 756–758 (1888), but also application of basic constitutional doctrines of fairness, see *Jones* v. *Cunningham*, 371 U. S. 236, 243 (1963), Congress, the Rule writers, and the courts have developed more complex procedural principles that regularize and thereby narrow the discretion that individual judges can freely exercise. Those principles seek to maintain the courts' freedom to issue the writ, aptly described as the "highest safeguard of liberty," *Smith* v. *Bennett*, 365 U. S. 708, 712 (1961), while at the same time avoiding serious, improper delay, expense, complexity, and interference with a State's interest in the "finality" of

its own legal processes. *Withrow* v. *Williams*, 507 U. S. 680, 698 (1993) (O'CONNOR, J., concurring in part and dissenting in part); *McCleskey, supra*, at 490–492; *Reed* v. *Ross*, 468 U. S. 1, 10 (1984). These legal principles are embodied in statutes, rules, precedents, and practices that control the writ's exercise. Within constitutional constraints they reflect a balancing of objectives (sometimes controversial), which is normally for Congress to make, but which courts will make when Congress has not resolved the question. See *Brecht* v. *Abrahamson*, 507 U. S. 619, 632–633 (1993).

Second, the fact that the writ has been called an "equitable" remedy, see, *e. g.*, *Gomez, supra*, at 653–654, does not authorize a court to ignore this body of statutes, rules, and precedents. "There is no such thing in the Law, as Writs of Grace and Favour issuing from the Judges." *Opinion on the Writ of Habeas Corpus*, Wilm. 77, 87, 97 Eng. Rep. 29, 36 (1758) (Wilmot, J.). Rather, "courts of equity must be governed by rules and precedents no less than the courts of law." *Missouri* v. *Jenkins*, 515 U. S. 70, 127 (1995) (THOMAS, J., concurring). See also *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, 417 (1975); The Federalist No. 78, p. 528 (J. Cooke ed. 1961). As Selden pointed out so many years ago, the alternative is to use each equity chancellor's conscience as a measure of equity, which alternative would be as arbitrary and uncertain as measuring distance by the length of each chancellor's foot. See 1 J. Story, Commentaries on Equity Jurisprudence 16 (13th ed. 1886).

That is why this Court, in *McCleskey*, said that concern about habeas petition abuses has led to "a complex and evolving body of equitable *principles* informed and controlled by historical usage, statutory developments, and judicial decisions." 499 U. S., at 489 (emphasis added). And it is why this Court, in *McCleskey*, also reaffirmed the importance, " 'in order to preclude individualized enforcement of the Constitution in different parts of the Nation,' " of " 'lay[ing] down as specifically as the nature of the problem permits the

standards or directions that should govern the District Judges in the disposition of applications for habeas corpus by prisoners under sentence of State Courts.'" *Id.*, at 496 (quoting *Brown* v. *Allen,* 344 U. S. 443, 501–502 (1953) (opinion of Frankfurter, J.)).

After all, equitable rules that guide lower courts reduce uncertainty, avoid unfair surprise, minimize disparate treatment of similar cases, and thereby help all litigants, including the State, whose interests in "finality" such rules often further. See *Barefoot,* 463 U. S., at 892; *Kuhlmann, supra,* at 451; *Townsend, supra,* at 313. See also *Coleman* v. *Thompson,* 501 U. S. 722, 750 (1991) (barring consideration of claims procedurally defaulted in state court absent cause and prejudice or a fundamental miscarriage of justice); *Teague* v. *Lane,* 489 U. S. 288, 299–316 (1989) (plurality opinion) (barring from habeas proceedings federal claims based on certain "new rules" of constitutional law); *Rose* v. *Lundy,* 455 U. S. 509, 522 (1982) ("[A] district court must dismiss habeas petitions containing both unexhausted and exhausted claims").

And the arguments against ad hoc departure from settled rules would seem particularly strong when dismissal of a *first* habeas petition is at issue. Dismissal of a *first* federal habeas petition is a particularly serious matter, for that dismissal denies the petitioner the protections of the Great Writ entirely, risking injury to an important interest in human liberty. See *Ex parte Yerger,* 8 Wall. 85, 95 (1869) (the writ "has been for centuries esteemed the best and only sufficient defence of personal freedom"); *Withrow, supra,* at 700 (O'CONNOR, J., concurring in part and dissenting in part) (decisions involving limitation of habeas relief "warrant restraint"). Even in the context of "second and successive" petitions—which pose a greater threat to the State's interests in "finality" and are less likely to lead to the discovery of unconstitutional punishments—this Court has created careful rules for dismissal of petitions for abuse of the writ. See *McCleskey, supra.*

This is not to say that a district court has no discretion in dealing with first federal habeas petitions. The Habeas Corpus Rules themselves provide district courts with ample discretionary authority to tailor the proceedings to dispose quickly, efficiently, and fairly of first habeas petitions that lack substantial merit, while preserving more extensive proceedings for those petitions raising serious questions. For instance, as noted above, the Rules permit a district court to dismiss summarily a first petition without waiting for the State's response if "it plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief." Habeas Corpus Rule 4. Moreover, even if the petition cannot be dismissed under that standard, the district court is still authorized to "take such other action as the judge deems appropriate." *Ibid.* The Advisory Committee's Note makes clear that this provision was

> "designed to afford the judge flexibility in a case where either dismissal or an order to answer may be inappropriate. For example, the judge may want to authorize the respondent to make a motion to dismiss based upon information furnished by respondent, which may show that petitioner's claims have already been decided on the merits in a federal court; that petitioner has failed to exhaust state remedies; that the petitioner is not in custody within the meaning of 28 U. S. C. § 2254; or that a decision in the matter is pending in state court. In these situations, a dismissal may be called for on procedural grounds, which may avoid burdening the respondent with the necessity of filing an answer on the substantive merits of the petition. In other situations, the judge may want to consider a motion from respondent to make the petition more certain. Or the judge may want to dismiss some allegations in the petition, requiring the respondent to answer only those claims which appear to have some arguable merit." 28 U. S. C., p. 478.

The Rules also afford the district court substantial discretion in the conduct of a case once an answer has been ordered. It may decide to order expansion of the record to facilitate a disposition on the merits without the need for an evidentiary hearing. Habeas Corpus Rule 7. Discovery is available only if "the judge in the exercise of his discretion and for good cause shown grants leave." Habeas Corpus Rule 6(a). And the district court is afforded a degree of discretion in determining whether to hold an evidentiary hearing. See Habeas Corpus Rule 8(a); *Townsend*, 372 U. S., at 318; *Keeney* v. *Tamayo-Reyes*, 504 U. S. 1, 11–12 (1992). Thus, the district court is afforded substantial discretion to expedite proceedings, cf. *Barefoot, supra,* at 894–895, in order quickly to dispose of meritless first petitions while at the same time preserving the important right of those raising serious habeas questions to have their claims thoroughly considered by the district court.

Third, a specific federal Habeas Corpus Rule, Rule 9(a), directly addresses the primary factor—delay—that led the Court of Appeals to dismiss the petition for "equitable reasons." That Rule says:

> "Delayed petitions. A petition may be dismissed *if* it appears that the state of which the respondent is an officer *has been prejudiced* in its ability to respond to the petition by delay in its filing unless the petitioner shows that it is based on grounds of which he could not have had knowledge by the exercise of reasonable diligence before the circumstances prejudicial to the state occurred." (Emphasis added.)

The Rule applies because Lonchar's petition is a "delayed petition." And the language of the Rule requires, as a condition of dismissal, a finding of "prejudice," which the District Court was not asked to, and did not, make. (Because the State specifically disavows reliance upon Rule 9(a), we do not consider what would constitute sufficient "prejudice"

to justify application of the Rule in the context of a last-minute habeas petition.) Instead, it asked the Court of Appeals to develop an equitable rule under which a "petition may be dismissed" for "delay in its filing" *without* the prejudice precondition.

But the history of the Rule makes plain that the prejudice requirement represents a critical element in the balancing of interests undertaken by Congress and the framers of the Rule which courts may not undermine through the exercise of background equitable powers. See *Bank of Nova Scotia v. United States*, 487 U. S. 250, 255 (1988) ("The balance struck by the Rule between societal costs and the rights of the accused may not casually be overlooked 'because a court has elected to analyze the question under the supervisory power'" (quoting *United States v. Payner*, 447 U. S. 727, 736 (1980)). The Advisory Committee's Note indicates that the very maxim upon which the Court of Appeals relied as authority for acting outside the Rules—the equitable maxim that "the petitioner's conduct may . . . disentitle him to relief," 58 F. 3d, at 592—was taken into account when the Rule's framers drafted Rule 9(a) and included its prejudice requirement. See Advisory Committee's Note on Habeas Corpus Rule 9, 28 U. S. C., p. 484. Moreover, Congress, when considering a draft of the Rule, see 28 U. S. C. § 2074, directly focused upon the prejudice requirement and *rejected*, by removing from the draft Rule, a provision that would have eased the burden of the prejudice requirement by presuming prejudice after a delay of five years. Compare Rules of Procedure: Communication from the Chief Justice of the United States Transmitting Rules and Forms Governing Proceedings Under Sections 2254 and 2255 of Title 28, H. R. Doc. No. 94–464, pp. 38–39 (1976), with Act of Sept. 28, 1976, Pub. L. 94–426, § 2(9), 90 Stat. 1335. See also H. R. Rep. No. 94–1471, p. 5 (1976) ("[I]t is unsound policy to require the defendant to overcome a presumption of prejudice"). Cf. *McCarthy v. Madigan*, 503 U. S. 140, 144 (1992)

(Even in an area, such as exhaustion, where judges have considerable discretionary authority, "appropriate deference to Congress' power to prescribe the basic procedural scheme under which a claim may be heard in a federal court requires fashioning of exhaustion principles in a manner consistent with congressional intent and any applicable statutory scheme").

We recognize there is considerable debate about whether the present Rule properly balances the relevant competing interests. See, e. g., U. S. Judicial Conference, Ad Hoc Committee on Federal Habeas Corpus in Capital Cases, Committee Report and Proposal 6, 18–21 (1989) (hereinafter Powell Report) (suggesting a statute of limitations for habeas petitions); American Bar Association, Toward a More Just and Effective System of Review in State Death Penalty Cases 29–30 (1990) (hereinafter ABA Report) (same). But, to debate the present Rule's effectiveness is to affirm, not to deny, its applicability. Moreover, that debate's focus upon Congress also reveals the institutional inappropriateness of amending the Rule, in effect, through an ad hoc judicial exception, rather than through congressional legislation or through the formal rulemaking process. See *Vasquez* v. *Hillery*, 474 U. S. 254, 265 (1986) ("[D]espite many attempts in recent years, Congress has yet to create a statute of limitations for federal habeas corpus actions. We should not lightly create a new judicial rule . . . to achieve the same end") (citation omitted); Appendix to this opinion (listing more than 80 bills that have proposed a statute of limitations for federal habeas cases since *Vasquez*, none of which has been adopted).

Fourth, contrary to the Court of Appeals' view, we do not believe that this Court, in *Gomez* v. *United States Dist. Court for Northern Dist. of Cal.*, 503 U. S. 653 (1992), authorized ad hoc equitable departures from the Habeas Corpus Rules. The Court of Appeals relied heavily on the statement:

"Even if we were to assume, however, that Harris could avoid the application of *McCleskey* to bar his claim, we would not consider it on the merits. Whether his claim is framed as a habeas petition or as a [42 U. S. C.] § 1983 action, Harris seeks an equitable remedy." *Id.*, at 653–654.

But, this statement, understood in context, does not mean that this Court authorized setting aside the Habeas Corpus Rules and refusing to consider a first habeas petition for generalized "equitable" reasons. As we explained above, *Gomez* was *not* a first habeas petition. Harris, after bringing four habeas petitions, argued that he still could raise a "method of execution" claim in a last-minute § 1983 action, to which habeas rules, like *McCleskey*'s abuse of the writ doctrine, would not apply. The quoted sentence simply says that these rules *would* apply, even if § 1983 were also a proper vehicle for his "method of execution" claim, since Harris was still seeking equitable relief and the equitable rationale underlying *McCleskey*'s abuse of the writ doctrine—avoiding, among other things, "last-minute attempts to manipulate the judicial process," 503 U. S., at 654; *McCleskey*, 499 U. S., at 484–485, 491–493—would apply to a suit challenging the method of execution, regardless of the technical form of action. *Gomez* did not, and did not purport to, work a significant change in the law applicable to the dismissal of first habeas petitions.

Fifth, the fact that Lonchar filed his petition at the "eleventh hour" does not lead to a different conclusion. We recognize that the Court in *Gomez* said that "[a] court may consider the last-minute nature of an application to stay execution in deciding whether to grant equitable relief." 503 U. S., at 654. And this Court has made similar statements in other cases. See, *e. g., Sawyer* v. *Whitley*, 505 U. S. 333, 341, n. 7 (1992) (judge may resolve doubts against petitioners who "delay their filings until the last minute with a view to obtaining a stay because the district court will lack

time to give them the necessary consideration before the scheduled execution"); *Herrera* v. *Collins*, 506 U. S. 390, 425–426 (1993) (O'CONNOR, J., concurring).

These statements do not help the State, however, for they all involve "second or successive" habeas petitions. The Rules specifically authorize dismissal of *those* petitions for "abuse of the writ." Habeas Corpus Rule 9(b). See also 28 U. S. C. § 2244(b) (authorizing dismissal when "the applicant has . . . deliberately withheld the newly asserted ground *or otherwise abused the writ*") (emphasis added). *McCleskey* gives content to the notion of "abuse of the writ," as do the cases just mentioned. These statements, therefore, reflect an effort to follow and to apply the Habeas Corpus Rules, not an effort to develop law outside the Rules.

Indeed, to try to devise some sensible way of supplementing *first* federal habeas petition rules with ad hoc equitable devices would prove difficult. As we discussed, *supra*, at 324, the interest in permitting federal habeas review of a first petition is quite strong. And, given the importance of a first federal habeas petition, it is particularly important that any rule that would deprive inmates of all access to the writ should be both clear and fair. As two prominent bodies charged with developing proposals for habeas law reform have pointed out, developing fair and effective rules to minimize the harms created by last-minute petitions in capital cases is quite complicated, requiring consideration of issues such as the State's control over setting execution dates, the time needed to exhaust state remedies, the common practice of substituting specialized capital counsel for habeas, and the time needed by habeas counsel to investigate claims, some of which (such as ineffective assistance of counsel) often cannot be raised on direct appeal. See ABA Report 26–29, 114–134; *id.*, at 29 ("In a system of review that employs artificial execution dates as a catalyst, there are *many* eleventh hours and *many* last minutes, because, if the petitioner does not seek a stay of execution at

virtually every level, the execution is imminent"); Powell Report 1 ("[P]risoners often cannot obtain qualified counsel until execution is imminent"). These bodies, consequently, have proposed a comprehensive set of interrelated changes, see ABA Report 5–39; Powell Report 5–7, as have recent legislative proposals. See, e. g., H. R. 3, 104th Cong., 1st Sess. (1995); H. R. 729, 104th Cong., 1st Sess. (1995); H. R. 2703, 104th Cong., 1st Sess. (1995); S. 3, 104th Cong., 1st Sess. (1995); S. 623, 104th Cong., 1st Sess. (1995); S. 735, 104th Cong., 1st Sess. (1995). This complexity offers a practical caution against a judicial attempt, outside the framework of the Habeas Corpus Rules, to fashion similar reforms concerning first federal habeas petitions.

Sixth, the special circumstances in this case—other than delay—do not warrant a different result. The earlier habeas petitions brought by Lonchar's sister and brother are beside the point. Lonchar did not assert his claims in those proceedings, nor did he conspire with his siblings to delay his execution. To the contrary, he opposed their petitions and prevailed in his opposition. See App. 22, 35, 48. These "next friend" petitions neither aggravate nor mitigate Lonchar's delay in filing his own petition during those six years.

Lonchar's filing and later withdrawal of his own *state* habeas petition would seem similarly beside the point. At most, the assertion and withdrawal of that petition would create a potential ground for a state-law procedural bar to a second state petition, which, in certain circumstances, might also prevent litigation of similar claims in federal court. See *Coleman*, 501 U. S., at 729–732. The State (despite its apparent agreement to Lonchar's withdrawal of the state petition "without prejudice," see App. 34, 161–163) has asserted just such a bar. It is free to litigate the matter on remand.

Nor do we believe that Lonchar's motive for filing this federal habeas petition can make a critical difference. Lonchar

did say that he filed this petition to delay his execution with the hope that the State would change its execution method. But Lonchar's petition also requested the traditional habeas relief of a new trial or resentencing, App. 362, and he told the District Court specifically that he had considered each and every claim and wanted the court to hear them. Normally courts will not look behind an action that states a valid legal claim on its face in order to try to determine the comparative weight a litigant places on various subjective reasons for bringing the claim. A valid antitrust complaint or environmental action, for example, does not suddenly become invalid simply because the litigant is subjectively indifferent about receiving the requested equitable relief, but instead primarily wants to please his or her family or obtain revenge. More importantly, litigation about a petitioner's subjective motivations risks adding to the complexity of habeas litigation, asking a subjective question (about the petitioner's *true* motives) that is often unanswerable and the very asking of which may encourage and reward the disingenuous. See *Murray* v. *Carrier*, 477 U. S. 478, 487 (1986) (rejecting a subjective test for determining "cause" for procedural default, in part because under such a rule "federal habeas courts would routinely be required to hold evidentiary hearings to determine what prompted counsel's failure to raise the claim in question").

In sum, we believe that this case should have been examined within the framework of the Habeas Corpus Rules and settled precedents, not according to generalized equitable considerations *outside* that framework. We, of course, express no view about the proper outcome of the application of the Rules.

The judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

## APPENDIX TO OPINION OF THE COURT

In the last 10 years, bills proposing a statute of limitations for federal habeas corpus petitions have been introduced every year in Congress, more than 80 bills in all. See S. 2301, 99th Cong., 2d Sess. (1986); S. 2850, 99th Cong., 2d Sess. (1986); H. R. 72, 100th Cong., 1st Sess. (1987); H. R. 73, 100th Cong., 1st Sess. (1987); H. R. 1333, 100th Cong., 1st Sess. (1987); H. R. 3777, 100th Cong., 1st Sess. (1987); S. 260, 100th Cong., 1st Sess. (1987); S. 1285, 100th Cong., 1st Sess. (1987); S. 1970, 100th Cong., 1st Sess. (1987); H. R. 5217, 100th Cong., 2d Sess. (1988); H. R. 1090, 101st Cong., 1st Sess. (1989); H. R. 1953, 101st Cong., 1st Sess. (1989); H. R. 2709, 101st Cong., 1st Sess. (1989); H. R. 3119, 101st Cong., 1st Sess. (1989); S. 88, 101st Cong., 1st Sess. (1989); S. 271, 101st Cong., 1st Sess. (1989); S. 1225, 101st Cong., 1st Sess. (1989); S. 1228, 101st Cong., 1st Sess. (1989); S. 1970, 101st Cong., 1st Sess. (1989); S. 1971, 101st Cong., 1st Sess. (1989); H. R. 3918, 101st Cong., 2d Sess. (1990); H. R. 4079, 101st Cong., 2d Sess. (1990); H. R. 4737, 101st Cong., 2d Sess. (1990); H. R. 4820, 101st Cong., 2d Sess. (1990); H. R. 5055, 101st Cong., 2d Sess. (1990); H. R. 5269, 101st Cong., 2d Sess. (1990); S. 2245, 101st Cong., 2d Sess. (1990); S. 2695, 101st Cong., 2d Sess. (1990); H. R. 18, 102d Cong., 1st Sess. (1991); H. R. 365, 102d Cong., 1st Sess. (1991); H. R. 1400, 102d Cong., 1st Sess. (1991); H. R. 3371, 102d Cong., 1st Sess. (1991); S. 19, 102d Cong., 1st Sess. (1991); S. 148, 102d Cong., 1st Sess. (1991); S. 149, 102d Cong., 1st Sess. (1991); S. 620, 102d Cong., 1st Sess. (1991); S. 635, 102d Cong., 1st Sess. (1991); S. 1151, 102d Cong., 1st Sess. (1991); S. 1241, 102d Cong., 1st Sess. (1991); S. 1335, 102d Cong., 1st Sess. (1991); S. 2305, 102d Cong., 2d Sess. (1992); S. 3292, 102d Cong., 2d Sess. (1992); H. R. 2217, 103d Cong., 1st Sess. (1993); H. R. 2321, 103d Cong., 1st Sess. (1993); H. R. 2847, 103d Cong., 1st Sess. (1993); H. R. 2872, 103d Cong., 1st Sess. (1993); H. R. 3131, 103d Cong., 1st Sess. (1993); H. R. 3315, 103d Cong., 1st Sess. (1993); S. 8, 103d Cong., 1st Sess.

(1993); S. 38, 103d Cong., 1st Sess. (1993); S. 47, 103d Cong., 1st Sess. (1993); S. 1356, 103d Cong., 1st Sess. (1993); S. 1441, 103d Cong., 1st Sess. (1993); S. 1488, 103d Cong., 1st Sess. (1993); S. 1607, 103d Cong., 1st Sess. (1993); S. 1657, 103d Cong., 1st Sess. (1993); H. R. 4018, 103d Cong., 2d Sess. (1994); H. R. 4055, 103d Cong., 2d Sess. (1994); H. R. 4079, 103d Cong., 2d Sess. (1994); H. R. 4092, 103d Cong., 2d Sess. (1994); H. R. 4197, 103d Cong., 2d Sess. (1994); H. R. 4848, 103d Cong., 2d Sess. (1994); H. R. 5008, 103d Cong., 2d Sess. (1994); H. R. 5134, 103d Cong., 2d Sess. (1994); S. 2389, 103d Cong., 2d Sess. (1994); H. R. 3, 104th Cong., 1st Sess. (1995); H. R. 729, 104th Cong., 1st Sess. (1995); H. R. 920, 104th Cong., 1st Sess. (1995); H. R. 2703, 104th Cong., 1st Sess. (1995); S. 3, 104th Cong., 1st Sess. (1995); S. 623, 104th Cong., 1st Sess. (1995); S. 735, 104th Cong., 1st Sess. (1995); S. 816, 104th Cong., 1st Sess. (1995).

CHIEF JUSTICE REHNQUIST, with whom JUSTICE SCALIA, JUSTICE KENNEDY, and JUSTICE THOMAS join, concurring in the judgment.

I agree with the Court that the judgment of the Court of Appeals should be reversed, but I am in sufficient disagreement with the Court's reasoning to write separately. I disagree with the Court's statement that "the Court of Appeals order vacating the stay is lawful *only if* dismissal of the petition would have been lawful." *Ante,* at 319. This statement, I believe, misreads our opinion in *Barefoot* v. *Estelle,* 463 U. S. 880 (1983), and ignores our reasoning in *Gomez* v. *United States Dist. Court for Northern Dist. of Cal.,* 503 U. S. 653 (1992).

The order under review does not dispose of a petition for a writ of habeas corpus; it vacates a stay of execution. The Court dismisses this distinction as a "preliminary matter," which "makes no difference," because "the Court of Appeals order vacating the stay is lawful *only if* dismissal of the petition would have been lawful." *Ante,* at 319. In my view,

the fact that we are reviewing an order vacating a stay is anything but "preliminary."

The Court is correct inasmuch as the underlying petition's likelihood of success is one factor to be considered in determining whether a stay should be entered. See *Hilton* v. *Braunskill*, 481 U. S. 770, 776 (1987). Rule 9 of the Rules Governing § 2254 Cases sets forth the grounds upon which a habeas petition may be dismissed other than the merits. Under Rule 9(b), a petition may be dismissed if it is found to be successive or abusive. Under Rule 9(a) it may also be dismissed

> "if it appears that the state of which the respondent is an officer has been prejudiced in its ability to respond to the petition by delay in its filing unless the petitioner shows that it is based on grounds of which he could not have had knowledge by the exercise of reasonable diligence before the circumstances prejudicial to the state occurred." 28 U. S. C. § 2254 Rule 9(a).

In this case, there was no basis for denying a stay on the ground that petitioner's habeas claims are without merit; for the purposes of considering the stay application, it is undisputed that those claims are substantial. Because the habeas petition was petitioner's first, it would also have been inappropriate to deny a stay on the ground that the petition could have been dismissed under Rule 9(b). I agree with the majority, *ante*, at 326, that, on the record before us, the petition likewise could not have been dismissed under Rule 9(a), because the Rule's elements were not satisfied. Although the District Court determined that petitioner engaged in delay, it made no determination that the delay prejudiced the State's ability to respond to the petition, within the meaning of Rule 9(a), by depriving the State of adequate time to respond or otherwise.

However, an applicant's likelihood of success is not the only consideration in determining whether he is entitled to a stay.

See *Hilton, supra,* at 776. The Habeas Rules say little if anything about this determination, and understandably so. It must be remembered the statutes governing habeas corpus, 28 U. S. C. §§ 2241–2255, were enacted in 1948, before the writ developed into a vehicle for federal courts "to reexamine federal constitutional issues even after trial and review by a state," *Brown* v. *Allen,* 344 U. S. 443, 459 (1953), and long before this Court declined to declare the death penalty unconstitutional, in *Gregg* v. *Georgia,* 428 U. S. 153 (1976), *Proffitt* v. *Florida,* 428 U. S. 242 (1976), and *Jurek* v. *Texas,* 428 U. S. 262 (1976). It would have been difficult for Congress to have anticipated the issues that arise in a system in which state death sentences are presumptively valid, but are "reexamined" in federal court before execution to consider constitutional challenges to the manner in which they were imposed.

In the typical noncapital habeas case, it is relatively easy to rule on an application to stay execution of a state sentence by consulting ordinary principles governing stays. Rarely, if ever, does a noncapital petitioner seek a stay of his sentence before the district court has passed on the merits of his petition. When a petitioner does make such a request, he usually has little chance of success on the merits, since he has been confined pursuant to a presumptively valid final judgment of conviction rendered by a state court. See 28 U. S. C. § 2254(d). If, after entertaining his petition, the district court awards the writ, the "stay equities" shift in favor of the petitioner, who will be enlarged unless the State can demonstrate that the equities counsel otherwise. *Hilton, supra,* at 774.

This easily managed system can be adapted to govern capital habeas cases, so long as the capital petitioner files his habeas petition sufficiently in advance of his execution date. If he files in a timely fashion, the district court may then consider the petition in due course, without in any way disturbing the sentence or execution date before ruling on the

petition's merits. But if, as in this case, the petitioner instead files an "eleventh hour" federal habeas petition, the customary principles must be revised accordingly. The district court may feel that it simply does not have time before the date of execution to adequately consider the merits of petitioner's claims, and will naturally be disposed, as the District Court was here, to enter a stay to enable it to do so.[1] In so doing, the district court sets aside a scheduled state execution of sentence, imposed by a presumptively valid final state judgment of conviction, on the basis of a tentative assessment that the judgment violates a federal constitutional right. Unless the eleventh-hour nature of the petition is taken into account, the late filing may induce the federal court to disregard federal-state comity and "frustrate . . . the States' sovereign power to punish offenders," *Engle* v. *Isaac,* 456 U. S. 107, 128 (1982), when such interference might have been avoided by timely filing.[2] The customary principles must also be revised to account for an attempt by a petitioner to manipulate the district court into granting relief where relief is clearly precluded.

In *Gomez* v. *United States Dist. Court for Northern Dist. of Cal.,* 503 U. S. 653 (1992), this Court demonstrated how last-minute or manipulative uses of the stay power constitute equitable grounds which can justify the denial of an application for stay of a state-court order of execution. The Court

---

[1] The Court is not concerned by this prospect because district courts have discretion to "order expansion of the record," authorize discovery, decide "whether to hold an evidentiary hearing," and generally "expedite proceedings." *Ante,* at 326. These tools are useless, however, when a petitioner deliberately leaves the district court only one day to review a petition's claims.

[2] Of course, there may be cases in which the eleventh-hour nature of the petition is attributable to the State's scheduling the execution date before the petitioner may appeal the denial of postconviction relief in a timely manner, not to the petitioner's deliberate refusal to seek relief. I am certain that district courts are capable of distinguishing between the two situations.

vacated a stay of execution issued on behalf of Robert Alton Harris, a California prisoner, pending consideration of a 42 U. S. C. § 1983 action alleging that his method of execution violated the Eighth Amendment. See 503 U. S., at 653. Because Harris had not raised the Eighth Amendment claim in any of the four federal habeas corpus petitions he had filed over 10 years, the Court considered the § 1983 claim "an obvious attempt to avoid the application of *McCleskey* v. *Zant,* 499 U. S. 467 (1991), to bar this successive claim for relief." *Ibid.* We could have vacated the stay on the basis of the successive-petition bar alone, but we explicitly did not:

> "Even if we were to assume, however, that Harris could avoid the application of *McCleskey* to bar his claim, we would not consider it on the merits. Whether his claim is framed as a habeas petition or as a § 1983 action, Harris seeks an equitable remedy. Equity must take into consideration the State's strong interest in proceeding with its judgment and Harris' obvious attempt at manipulation. This claim could have been brought more than a decade ago. There is no good reason for this abusive delay, which has been compounded by last-minute attempts to manipulate the judicial process. A court may consider the last-minute nature of an application to stay execution in deciding whether to grant equitable relief." *Id.,* at 653–654 (citations omitted).

Our order confirms that "abusive delay"—waiting until the last minute to submit a claim that could have been submitted earlier—and "obvious attempt[s] at manipulation"—in that case, asking the court to exercise its equitable powers in defiance of a clearly applicable legal rule precluding relief on the merits—constitute equities to be considered in ruling on the prayer for relief. More important, because we explained that this misconduct constituted sufficient grounds to deny Harris' stay application, "[e]ven if" *McCleskey* did not bar

his claim, we made clear that such abuse may tip the scales decisively against a stay applicant regardless of the applicant's likelihood of success on the merits.[3]

*Gomez* also confirms that a habeas petitioner's misconduct in applying for a stay may disentitle him to the stay even if the petition is his first. The inequitable conduct *Gomez* criticized, abusive delay and manipulation, may be present in any stay application. In *Gomez* we did not equivocate when we said: "Equity must take into consideration [an] obvious attempt at manipulation. . . . A court may consider the last-minute nature of an application to stay execution in deciding whether to grant equitable relief." 503 U. S., at 654 (citations omitted). It may be admitted that there would be a stronger presumption in favor of deciding the merits of a first-time petition than for a successive petition. The successive nature of a petition gives rise to an additional concern counseling against review of the merits: that the petitioner is frustrating the State's attempts to execute its judgment by exploiting the fact that ordinary principles of res judicata do not apply in habeas corpus. *McCleskey* v. *Zant*, 499 U. S. 467, 479, 491–492 (1991). It does not follow, however, that because a first-time petitioner does not abuse the writ under Rule 9(b) he may never be found to have engaged in the misconduct we criticized in *Gomez*; it means only that misconduct by such a petitioner is less likely to result in a refusal to grant a stay in order to consider the merits of the petition.

The majority attempts to distinguish *Gomez* because the matter before the Court in that case was "not a *first* habeas petition." *Ante*, at 321. This reading is wholly implausible, because the first paragraph of the Court's order had already discussed the fact that Harris was not a first-time petitioner.

---

[3] The § 1983 action was a class-action suit, of which Harris was one member. I note that the claim that the Court declined to consider on the merits has enough merit for the class plaintiffs to have prevailed in district court and the court of appeals. *Fierro* v. *Gomez*, 77 F. 3d 301 (CA9 1996).

If the paragraph about Harris' misconduct in relation to his application, quoted above, had legal significance only if his petition was successive, it would have been superfluous.

To support its view that a stay must be granted if a first federal habeas petition is not dismissed, the Court relies on our decision in *Barefoot* v. *Estelle*, 463 U. S. 880 (1983). But *Barefoot* and the present case arose in different contexts. The question presented and decided in *Barefoot* only addressed how the merits of the habeas petition may determine whether the petitioner obtains a stay. *Id.*, at 887 (announcing the Court was considering "the appropriate standard for granting or denying a stay of execution pending disposition of an appeal by a federal court of appeals by a death-sentenced federal habeas corpus petitioner"); *id.*, at 891 (affirming the denial of a stay because the Court of Appeals "ruled on the merits of [Barefoot's] appeal"). The issue in the present case is quite different: whether a petitioner's course of conduct in seeking the writ may be considered by the district court in deciding whether to grant a stay. To the extent that the Court's reading of *Barefoot* depends on the belief that a decision on a first federal habeas petition is somehow necessary to validate a state conviction, the Court ignores *Barefoot*'s assertion to the contrary:

> "The role of federal habeas proceedings . . . is secondary and limited. Federal courts are not forums in which to relitigate state trials. . . . The procedures adopted to facilitate the orderly consideration and disposition of habeas petitions are not legal entitlements that a defendant has a right to pursue irrespective of the contribution these procedures make toward uncovering constitutional error." *Id.*, at 887–888.

And, contrary to the Court's refusal to consider whether *Barefoot*'s "rationale" might brook a distinction between seasonable and eleventh-hour first habeas petitions, *ante*, at 321, our opinion warned that federal habeas corpus is *not* "a

means by which a defendant is entitled to delay an execution indefinitely." 463 U. S., at 887.

I nonetheless agree with the Court that the Court of Appeals erred in vacating the stay granted in this case by the District Court. The District Court did not consider whether petitioner's conduct in court constituted misconduct so abusive that it disentitled him to a stay; it focused solely on the likelihood that petitioner's habeas petition might be dismissed. Although the court determined that petitioner had "abused the writ," it did not rely on this finding to deny a stay, correctly concluding that a first habeas petition may not be dismissed on the basis of abuse of the writ. App. 61–62. There was no determination that petitioner's habeas petition could be dismissed under Rule 9(a). There is no other ground under which to dismiss a first petition other than the merits, and the Court of Appeals erred in concluding otherwise.

Although the findings supporting the District Court's determination that petitioner abused the writ would go a long way toward supporting affirmance on the ground that petitioner's misconduct disentitled him to a stay, reversal is still in order. I agree with the Court that petitioner's conduct in the next-friend proceedings "neither aggravate nor mitigate Lonchar's delay in filing." *Ante*, at 331. Petitioner may not be blamed for having asserted his competence and his control over his habeas claims, because our case law required the District Court to establish as much. See *Whitmore* v. *Arkansas*, 495 U. S. 149, 165 (1990). Nor should he be blamed for his brother's and sister's desire to protect him, although it would be a different case if the record established that his relatives and he were colluding to stay his execution but avoid putting his claims before the court, so as to keep his options open in the future. Because the District Court erred in concluding that petitioner was culpable for the course of the next-friend proceedings and "[i]t is a paradigmatic abuse of discretion for a court to base its judgment on

an erroneous view of the law," *Schlup* v. *Delo*, 513 U. S. 298, 333 (1995) (O'CONNOR, J., concurring) (citing *Cooter & Gell* v. *Hartmarx Corp.,* 496 U. S. 384, 405 (1990)), the District Court necessarily abused its discretion in determining there was abuse of the writ. Reconsideration of this determination and the other equities of petitioner's stay application is now in order. I therefore concur in the judgment of reversal.