PRYOR, Circuit Judge,
concurring:
I join fully in the opinion of the majority. I write separately to respond to the dissenting opinions, which argue that this Court is “morally bankrupt,” Dissenting Op. of Hill, J., at 1337, unless we find some *1325 way to read the Suspension Clause creatively or otherwise find a way to hold that Gilbert is entitled to immediate release from prison. The ■ dissents are overwrought for several reasons, but I address only a few flaws that are particularly disturbing.
The dissents argue that Gilbert has not had a “meaningful opportunity” to challenge the legality of his imprisonment, Dissenting Op. of Barkett, J., at 1329; Dissenting Op. of Martin, J., at 1335 n.3; Dissenting Op. of Hill, J., at 1337, but that assertion is silly. To the contrary, the federal judiciary knows Ezell Gilbert well: Gilbert pleaded guilty to drug charges in 1996; he appealed his sentence to this Court, and we affirmed, United States v. Gilbert, 138 F.3d 1371 (11th Cir.1998); he petitioned for rehearing en banc, but his petition was denied, United States v. Gilbert, 156 F.3d 188 (1998) (unpublished table decision); he petitioned for a writ of certiorari, but that petition was denied too, Gilbert v. United States, 526 U.S. 1111, 119 S.Ct. 1754, 143 L.Ed.2d 787 (1999); he filed a motion to vacate his sentence, which the district court denied; he tried to appeal this denial, but this Court denied him a certificate of appealability. Gilbert, like all other criminals prosecuted in the United States, has been afforded a panoply of rights, including the right to a jury trial, the right to counsel, and the rights to appeal and to seek postconviction relief.
Several constitutional provisions grant rights to criminals like Gilbert, but the Suspension Clause is not one of them. The Supreme Court explained, shortly after the ratification of the Constitution, that “for the meaning of the term habeas corpus, resort may unquestionably be had to the common law.” Ex parte Bollman, 4 Cranch 75, 93-94, 2 L.Ed. 554 (1807) (Marshall, C.J.). “[A]t common law a judgment of conviction rendered by a court of general criminal jurisdiction was conclusive proof that confinement was legal,” United States v. Hayman, 342 U.S. 205, 211, 72 S.Ct. 263, 268, 96 L.Ed. 232 (1952), a fact curiously omitted in the discussion of Hay-man in one of the dissenting opinions, Dissenting Op. of Martin, J., at 1333. Courts instead “exercised the writ in light of its most basic purpose, avoiding serious abuses of power by a government, say a king’s imprisonment of an individual without referring the matter to a court.” Lonchar v. Thomas, 517 U.S. 314, 322, 116 S.Ct. 1293, 1298, 134 L.Ed.2d 440 (1996). Early American habeas legislation protected citizens primarily from arbitrary detention, true to the English Habeas Corpus Act of 1679. See Dallin H. Oaks, Habeas Corpus in the States — 1776-1865, 32 U. Chi. L.Rev. 243, 251-52 (1965). That Act empowered judges to order the release of prisoners “other than persons Convict or in Execution.” 31 Car. 2, c. 2 § 3. The Judiciary Act of 1789 embodied this limitation. “As limited by the act of 1789, [the writ] did not extend to cases of imprisonment after conviction, under sentences of competent tribunals.... ” Ex parte Yerger, 75 U.S. (8 Wall.) 85, 101, 19 L.Ed. 332 (1868). For example, when Tobias Watkins petitioned the Supreme Court for an original writ following his conviction and imprisonment for what he alleged was a non-existent crime, the Court denied his petition in the following terms written by Chief Justice John Marshall: “An imprisonment under a judgment cannot be unlawful, unless that judgment be an absolute nullity; and it is not a nullity if the court has general jurisdiction of the subject, although it should be erroneous.” Ex parte Watkins, 28 U.S. (3 Pet.) 193, 203, 7 L.Ed. 650 (1830). Because no one contends that the district court lacked jurisdiction to sentence Gilbert, he would not be entitled to the writ at common law.
The arguments of my dissenting colleagues that the Suspension Clause enti *1326 ties Gilbert to relief, Dissenting Op. of Barkett, J., at 1329; Dissenting Op. of Martin, J., at 1331; Dissenting Op. of Hill, J., at 1337, must presume that the Suspension Clause underwent a metamorphosis sometime between 1789 and 2011. The dissents understandably fail to cite any authorities for this position. The Supreme Court has never held that the Suspension Clause protects anything more than the writ as understood in 1789. See Boumediene v. Bush, 553 U.S. 723, 746, 128 S.Ct. 2229, 2248, 171 L.Ed.2d 41 (2008) (“[T]he Court has said that ‘at the absolute minimum’ the [Suspension] Clause protects the writ as it existed when the Constitution was drafted and ratified.”) (quoting INS v. St. Cyr, 533 U.S. 289, 301, 121 S.Ct. 2271, 2279, 150 L.Ed.2d 347 (2001)); St. Cyr, 533 U.S. at 301, 121 S.Ct. at 2279 (“[A]t the absolute minimum, the Suspension Clause protects the writ ‘as it existed in 1789.’ ”) (quoting Felker v. Turpin, 518 U.S. 651, 663-64, 116 S.Ct. 2333, 2340, 135 L.Ed.2d 827 (1996)); Felker, 518 U.S. at 663-64, 116 S.Ct. at 2340 (“But we assume, for purposes of decision here, that the Suspension Clause of the Constitution refers to the writ as it exists today, rather than as it existed in 1789.”). Two of our sister circuits have concluded that the Suspension Clause protects access to the writ only as it was understood in 1789. The Seventh Circuit held, “What is protected from suspension is the writ that limits a person’s detention by the executive branch without trial. There is no constitutional entitlement to post-judgment collateral review by the inferior federal courts, let alone to unending rounds of such review.” Benefiel v. Davis, 403 F.3d 825, 827 (7th Cir. 2005) (Easterbrook, J.); see also Lindh v. Murphy, 96 F.3d 856, 867-68 (7th Cir. 1996) (en banc), rev’d on other grounds, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). The Third Circuit similarly reasoned, “[I]t would appear that the complete denial of the writ of habeas corpus to convicted federal prisoners would not violate the Constitution” because in 1789 “habeas corpus was not available to persons convicted of crime to test the legality of their convictions.” United States v. Anselmi, 207 F.2d 312, 314 (3d Cir.1953). Several justices of the Supreme Court have also interpreted the Suspension Clause to protect nothing more than it protected in 1789. See Boumediene, 553 U.S. at 844, 128 S.Ct. at 2303 (Scalia, J., dissenting, joined by Roberts, C.J., and Thomas and Alito, JJ.) (“The nature of the writ of habeas corpus that cannot be suspended must be defined by the common-law writ that was available at the time of the founding.”); Swain v. Pressley, 430 U.S. 372, 384, 97 S.Ct. 1224, 1231, 51 L.Ed.2d 411 (1977) (Burger, C.J., concurring, joined by Blackmun and Rehnquist, JJ.) (“The sweep of the Suspension Clause must be measured by reference to the intention of the Framers and their understanding of what the writ of habeas corpus meant at the time the Constitution was drafted.”); D’Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 471 n. 9, 62 S.Ct. 676, 686 n. 9, 86 L.Ed. 956 (1942) (Jackson, J., concurring) (“Particularly in the clauses dealing with the rights of the individual, the Constitution uses words and phrases borrowed from the common law, meaningless without that background, and obviously meant to carry their common-law implications. Thus, we find in it ... ‘Privilege of the Writ of habeas Corpus ....’”)
Because the Suspension Clause does not provide any rights to prisoners convicted and sentenced by courts of competent jurisdiction, any relief that Congress chooses to provide to federal prisoners is, to borrow language from a dissent, a “gift[ ] that may be bestowed or withheld.” Dissenting Op. of Hill, J., at 1337 n.2. And if a federal prisoner suffers some “injustice” that Congress has not empowered the courts to correct, the President can exer *1327 cise his “Power to grant Reprieves and Pardons.” U.S. Const. Art. II, § 2, cl. 1. There is nothing unjust about federal courts not granting relief when the law does not provide a right to relief.
But the dissents fret, what is a judge to do when he or she thinks Congress was not generous enough when it gave prisoners the right to attack collaterally their sentences? The dissents offer an answer: Help Congress and the President with their work. After all, the President may be too busy “with the vast responsibility of exercising executive powers,” Dissenting Op. of Martin, J., at 1333, and Congress may be too busy with other legislative responsibilities to provide relief to a recidivist serving a federal sentence that is less than the statutory maximum. In the light of the growing national debt, releasing Gilbert from prison may also be a good idea because his incarceration is “very expensive.” Id., at 1334.
This grandiose conception of judicial supremacy would threaten the separation of powers and undermine the rule of law. The fundamental “role of the courts” is not to “hear [the] cases” presented by prisoners “detained without a remedy” and give them relief not provided by law. Id. at 1336. The Supreme Court has held that, subject to constitutional limitations, rules that govern the application of the writ “reflect a balancing of objectives (sometimes controversial), which is normally for Congress to make, but which courts will make when Congress has not resolved the question.” Lonchar, 517 U.S. at 323, 116 S.Ct. at 1298. We do not have to balance competing objectives here because Congress has already done so. Congress chose to deny Gilbert the right to a successive motion to vacate his sentence. The Supreme Court has held that Congress did not violate the Suspension Clause when it imposed this same restriction on petitions filed by state prisoners. Felker, 518 U.S. at 664, 116 S.Ct. at 2340. This undisputed fact should end our inquiry. The argument that “this court sits at the apex of its power to free Mr. Gilbert” because “we do not address a state court conviction here,” Dissenting Op. of Martin, J., at 1335, disregards the fact that review of Gilbert’s sentence would disturb the division of powers between the three branches of the federal government. We neither “shirk[] our duty” nor “diminish the institution of the federal courts,” id. at 1333, when we respect the separation of powers provided by the Constitution. We instead provide that respect “to the end it may be a government of laws and not of men.” Mass. Const. pt. 1, art. XXX. See Morrison v. Olson, 487 U.S. 654, 697, 108 S.Ct. 2597, 2622, 101 L.Ed.2d 569 (1988) (Scalia, J., dissenting) (explaining the origin of this phrase as tied to the separation of powers).
After charging that this Court is “morally bankrupt” unless it can find a way to do “justice,” Dissenting Op. of Hill, J., at 1337, Judge Hill’s dissent notes that the law sometimes provides relief to individuals as unsympathetic as Gilbert, such as the rapist Ernesto Miranda, id. at 1337, but Miranda’s victory does not mean that the judiciary must correct every error committed at trial or sentencing years after the sentence has become final. The first citation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), by the Supreme Court proves the point. Prisoners sentenced to death before 1966, whose confessions were obtained in violation of the rule established in Miranda, were denied relief because, as Justice William Brennan announced for the Court, Miranda did not apply retroactively. Johnson v. New Jersey, 384 U.S. 719, 732, 86 S.Ct. 1772, 1780, 16 L.Ed.2d 882 (1966); see also Campbell v. Wainwright, 738 F.2d 1573, 1580 (11th Cir.1984) (Hill, J.) (refusing to apply retroactively a new rule regarding racial discrimination in jury selection).
*1328 The denial of Gilbert’s petition'does not mean that “[t]he Great Writ is dead,” Dissenting Op. of Hill, J., at 1386. Far from it. The federal judiciary steadfastly has protected the writ and ensured that it remains available to those who would have been entitled to it in 1789. The Supreme Court recently held that the writ is available even to enemy combatants who are captured abroad and detained by the United States at Guantanamo Bay, Cuba. Boumediene, 553 U.S. 723, 128 S.Ct. 2229, 171 L.Ed.2d 41. The writ is also available to Americans who are captured in a foreign country and detained at a military base operated by an American-led multinational coalition, Munaf v. Geren, 553 U.S. 674, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008); to illegal aliens detained in the United States, Clark v. Martinez, 543 U.S. 371, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005); to a former Panamanian dictator who recently unsuccessfully challenged his extradition to France, Noriega v. Pastrana, 564 F.3d 1290 (11th Cir.2009); and to convicted sex offenders to challenge their civil commitment, Dutil v. Murphy, 550 F.3d 154 (1st Cir.2008).
Congress generously has made the writ available to prisoners serving sentences imposed by state and federal courts even though those prisoners would not have been entitled to the writ in 1789. We have entertained thousands of petitions from prisoners sentenced by state and federal courts. The primary effect of the expansion of the availability of the writ beyond the requirements of the Suspension Clause has not been to vindicate the rights of prisoners, but to undermine the finality of judgments. A recent empirical study found that, for most state prisoners, the writ is an illusory remedy as it is granted for only 0.35 percent of petitions filed by state prisoners not sentenced to death. Nancy J. King & Joseph L. Hoffmann, Habeas for the Twenty-First Century 79 (2011). In addition, state prisoners sentenced to death, but whose guilt is beyond dispute, routinely use postconviction remedies provided by Congress and by state governments to litigate the legality of their sentences for decades following conviction. See, e.g., Harvey v. Warden, Union Corr. Inst., 629 F.3d 1228 (11th Cir.2011) (challenge to sentence imposed in 1986); Kokal v. Sec’y, Dep’t of Corr., 623 F.3d 1331 (11th Cir.2010) (challenge to sentence imposed in 1984), petition for cert. filed (U.S. Mar. 21, 2011) (No. 10-9693) ; Puiatti v. McNeil, 626 F.3d 1283 (11th Cir.2010) (challenge to sentence imposed in 1984), petition for cert. filed (U.S. Apr. 21, 2011) (No. 10-1302). The writ is also available to challenge, not only convictions and sentences, but humdrum matters such as the failure to grant early release from prison or the revocation of “good time” credits. See, e.g., Brown v. McFadden, 416 F.3d 1271 (11th Cir.2005); Medberry v. Crosby, 351 F.3d 1049 (11th Cir.2003). The above-referenced empirical study found that, of the 2,384 petitions in a sample of petitions filed by state prisoners not sentenced to death, 17.8 percent of the petitions did not challenge the constitutionality of a conviction or a sentence, and none of these petitions were granted. King & Hoffmann, supra, at 154-55.
It is also absurd to assert that we have “rendered] the savings clause a dead letter.” Dissenting Op. of Martin, J., at 1332. By operation of the savings clause for motions to vacate, 28 U.S.C. § 2255(e), Congress has allowed federal prisoners to petition for writs of habeas corpus when a decision of the Supreme Court applies retroactively and “establishes the petitioner was convicted for a nonexistent offense” and circuit precedent prevented the petitioner from raising the issue on direct appeal or in a motion to vacate. Wofford v. Scott, 177 F.3d 1236, 1244 (11th Cir.1999); see also In re Davenport, 147 F.3d *1329 605, 611 (7th Cir.1998). In other words, Tobias Watkins’s twenty-first century counterpart would be statutorily entitled to the writ.
The dissents trivialize the Great Writ when they argue that it must issue to reverse the sentence of a confessed and recidivist drug dealer, who has already challenged his conviction and sentence both on direct and collateral review, only so that he may be resentenced by a court that could impose a sentence even greater than the one originally imposed. See Schneckloth v. Bustamonte, 412 U.S. 218, 275, 93 S.Ct. 2041, 2072, 36 L.Ed.2d 854 (1973) (Powell, J., concurring) (“There has been a halo about the ‘Great Writ’ that no one would wish to dim. Yet one must wonder whether the stretching of its use far beyond any justifiable purpose will not in the end weaken rather than strengthen the writ’s vitality.”); Brown v. Allen, 344 U.S. 443, 536, 73 S.Ct. 397, 425, 97 L.Ed. 469 (1953) (Jackson, J., concurring) (“[I]t [is] important to adhere to procedures which enable courts readily to distinguish a probable constitutional grievance from a convict’s mere gamble on persuading some indulgent judge to let him out of jail.... [We should not] sanction[ ] progressive trivialization of the "writ until floods of stale, frivolous and repetitious petitions inundate the docket of the lower courts and swell our own.”). The Great Writ developed in England as a tool to challenge arbitrary detentions by the government that fortunately have rarely been seen in this country. The Framers enshrined the protection of the Great Writ in the Constitution out of awareness of the excesses of British monarchs. An expansive application of the writ is “at odds with the historic meaning of habeas corpus — to afford relief to those whom society has ‘grievously wronged.’ ” Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710, 1721, 123 L.Ed.2d 353 (1993).
Judges cannot mold the Suspension Clause to provide relief whenever they feel sorry for a prisoner or to comport with their personal sense of justice, and that fact does not mean that the “Great Writ is dead.” Congress allowed prisoners to attack collaterally their sentences, but Congress had every right to restrict second or successive collateral attacks. Gilbert is not entitled to relief.