**Troy A. ASHMUS, Petitioner,**

v.

**Arthur CALDERON, Warden
of California State Prison at
San Quentin, Respondent.**

**No. C 93–0594 TEH.**

United States District Court,
N.D. California.

Dec. 24, 1998.

Michael Laurence, Gary D. Sowards, Jean R. Sternberg, Esq., Sternberg, Sowards & Laurence, San Francisco, CA, for Petitioner.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Senior Assistant Attorney General, Dane R. Gillette, Senior Assistant Attorney General, Ronald S. Matthias, Supervising Deputy Attorney General, CA State Attorney General's Office, San Francisco, CA, for Respondent.

### ORDER RE: APPLICABILITY OF CHAPTER 154

THELTON E. HENDERSON, District Judge.

## I. BACKGROUND

### A. Introduction

This matter comes before the Court on respondent's request that the parties submit supplemental briefs addressing the applicability of Chapter 154 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")[1] to these proceedings. Chapter 154 provides expedited habeas review procedures and other substantive benefits to states that qualify to "opt in." In order to qualify, states must establish a system to assure that capital defendants receive compe-

tent legal representation for their state habeas claims. In view of the important consequences that attend a decision as to whether Chapter 154 applies to these proceedings, the Court granted respondent's request and heard oral argument on the issue on November 9, 1998.

### B. Procedural History

Petitioner is a prisoner sentenced to death by the State of California. The California Supreme Court appointed counsel for his automatic appeal on March 4, 1987, and affirmed his conviction and death sentence on December 5, 1991, *People v. Ashmus,* 54 Cal.3d 932, 2 Cal.Rptr.2d 112, 820 P.2d 214 (1991), *rehearing denied,* Jan. 29, 1992, *cert. denied,* 506 U.S. 841, 113 S.Ct. 124, 121 L.Ed.2d 79 (1992). Petitioner initiated these federal habeas proceedings on February 17, 1993, by filing an Application for Appointment of Counsel and a Request for Stay of Execution. Current counsel for petitioner were appointed in August, 1995.

On April 24, 1996, the same day that President Clinton signed AEDPA into law, Petitioner filed a class action with this Court seeking declaratory and injunctive relief from California's attempt to "opt in" and apply Chapter 154 against a class of capital defendants. *Ashmus, et al. v. Calderon, et al.,* No. C96–1533 TEH (N.D.Cal.). After extensive briefing and hearings on the issue the Court granted declaratory relief and issued a preliminary injunction enjoining California from asserting Chapter 154. *See Ashmus,* No. C96–1533 TEH (N.D.Cal. May 15, 1996) (Order Modifying and Extending TRO). On June 14, 1996, the Court issued comprehensive findings of fact and conclusions of law. 935 F.Supp. 1048 (N.D.Cal. 1996). Although the Ninth Circuit affirmed this decision, *Ashmus v. Calderon,* 123 F.3d 1199 (9th Cir.1997), the Supreme Court reversed and remanded with instructions to dismiss the complaint for want of an Article III case or controversy sufficient to confer federal jurisdiction over the class action. *Calderon v. Ashmus,* 523 U.S. 740, 118 S.Ct.

1. Pub.L. 104–132, §§ 101–107, 110 Stat. 1214, 1217–26 (Apr. 24, 1996), *amending* 28 U.S.C. §§ 2244 and 2253–55 (modifying existing Chap-

ter 153), *and further codified at* 28 U.S.C. §§ 2261–66 (adding Chapter 154).

1694, 140 L.Ed.2d 970 (1998). The Supreme Court did not reach the merits of any rulings made by this Court or the Ninth Circuit regarding the applicability of Chapter 154.[2] This Court subsequently dismissed the class action, *Ashmus*, No. C96–1533 TEH, 1998 WL 765051 (N.D.Cal. Oct. 28, 1998) (Order Dismissing Complaint & Dissolving Injunction), and California has re-asserted the applicability of Chapter 154 in numerous capital cases statewide, including petitioner's. For the reasons enumerated below, the Court finds that California does not meet the requirements for applying Chapter 154 to petitioner.

## II. DISCUSSION

### A. The Statute: Chapter 154

For over a decade Congress has contemplated habeas corpus reform. Indeed, Title I of AEDPA represents the culmination of legislative deliberation on the subject going back to a 1989 proposal by the Ad Hoc Committee on Federal Habeas Corpus in Capital Cases. Formed by Chief Justice William Rehnquist in June of 1988 and chaired by former Associate Justice Lewis Powell, the committee was charged with "inquir[ing] into the 'necessity and desirability of legislation directed toward avoiding delay and lack of finality' in capital cases ...."[3] Chapter 154 essentially codifies the proposal made by the Powell Committee. *See Ashmus*, 935 F.Supp. at 1055–56.

Chapter 154 provides two distinct methods for states to "opt in" and invoke Chapter 154's rules designed to reduce delay and enhance finality: (1) a "post-conviction" procedure for states that provide, among other things, competent habeas counsel following final state conviction, and (2) a "unitary review procedure" for states that provide competent counsel for an integrated or simultaneous collateral and direct appeal.[4] Although California is attempting to opt in under the unitary review procedure, it is worth detailing the requirements of both procedures since a proper construction of each will benefit from examination of the other.

The post-conviction procedure is set forth in section 2261. According to section 2261, Chapter 154 "shall apply to cases arising under section 2254 brought by prisoners in State custody who are subject to a capital sentence ... *only if* the provisions of subsection (b) and (c) are satisfied." 28 U.S.C. § 2261(a) (emphasis added). Subsection (b) provides:

> This chapter is applicable if a state establishes by statute, rule of its court of last resort, or by another agency authorized by state law, a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State post-conviction proceedings brought by indigent prisoners whose capital convictions and sentences have been upheld on direct appeal to the court of last resort in the State or have otherwise become final for State law purposes. The rule of court or statute must provide standards of competency for the appointment of such counsel.

28 U.S.C. § 2261(b). Subsection (c) requires that any mechanism established "must offer counsel to all State prisoners under capital sentence." 28 U.S.C. § 2261(c). The mecha-

---

**2.** Although respondent correctly insists that this Court's ruling and the ruling of the Ninth Circuit are no longer binding precedent, the reasoning of these decisions retains persuasive force even if only as guidance on recurring issues. *See Orhorhaghe v. I.N.S.*, 38 F.3d 488, 493 n. 4 (9th Cir.1994) (vacated decision, although not binding, "is still persuasive authority").

**3.** Judicial Conference of the United States Ad Hoc Committee on Federal Habeas Corpus in Capital Cases, Report on Habeas Corpus in Capital Cases, 45 Crim. L. Rep. (BNA) 3239 (Sept. 27, 1989) (the "Powell Committee Report"); cited hereinafter at 135 Cong. Rec. S13471–04, 13481 (as appended to S. 1760, a bill incorporating the Powell Committee's recommendations).

**4.** The most significant addition to the Powell Committee proposal is the section permitting a state to opt in if it has a qualifying unitary review procedure. 28 U.S.C. § 2265. The Powell Committee considered and proposed a qualifying procedure for post-conviction collateral attack—unitary review procedures were not proposed until later. *See* 137 Cong. Rec. at S3221–22 (March 13, 1991) (Section–by–Section Analysis of the Comprehensive Violent Crime Control Act of 1991) [hereinafter "1991 Analysis"]. The relevant portions of the Comprehensive Violent Crime Control Act are identical to the Chapter 154 legislation signed into law as part of AEDPA.

nism must further "provide for the entry of an order by a court of record" which either appoints counsel "upon a finding that the prisoner is indigent and has accepted the offer" or denies appointment on grounds that the prisoner intelligently rejected the offer or was not indigent. *Id.* Unless expressly requested by the prisoner, no counsel who represented the prisoner at trial or on direct appeal may be appointed for the habeas representation. 28 U.S.C. § 2261(d). Finally, subsection (e) precludes habeas relief for ineffective or incompetent counsel during the State or Federal post-conviction process. 28 U.S.C. § 2261(e).

The unitary review procedure for appointment of competent counsel is almost identical to section 2261(b):

> For purposes of this section, a "unitary review" procedure means a State procedure that authorizes a person under sentence of death to raise, in the course of direct review of the judgment, such claims as could be raised on collateral attack. This chapter shall apply, as provided in this section, in relation to a State unitary review procedure if the State establishes by rule of its court of last resort or by statute a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in the unitary review proceedings, including expenses relating to the litigation of collateral claims in the proceedings. The rule of court or statute must provide standards of competency for the appointment of such counsel.

28 U.S.C. § 2265(a). Thus the only difference, apart from covering states that integrate direct appeal and collateral attacks, is that section 2265(a) does not allow for a mechanism to be established by an "agency authorized by state law." *Cf.* 28 U.S.C. § 2261(b). Only a statute or rule of court can establish a mechanism under section 2265(a). Following and incorporating section 2261(c), the unitary review procedures require states to offer and appoint counsel for all indigent capital defendants who accept in order to qualify for the benefits of Chapter 154. 28 U.S.C. § 2265(b). The unitary review procedures also preclude trial counsel from representing a capital defendant in his direct appeal and collateral attack. *Id.; cf.* 28 U.S.C. § 2261(d).

To summarize, under both qualifying procedures, a state must establish: (1) a mechanism for appointment, compensation and payment of reasonable litigation expenses of competent counsel; and (2) standards provided by statute or rule of court to assure the competency of appointed counsel. Subject to narrow exceptions, a state must also offer and appoint, by entry of a court order, counsel for *all* indigent capital prisoners. Failure to establish any of these qualifying procedures is fatal to a claim that Chapter 154 applies.

### B. The Quid Pro Quo

There are significant procedural and substantive benefits inuring to a state that qualifies to apply Chapter 154. *See Lindh v. Murphy,* 521 U.S. 320, ——, 117 S.Ct. 2059, 2063, 138 L.Ed.2d 481 (1997) (where Chapter 154 applies, "it will have substantive as well as purely procedural effects"). First, prisoners may not assert ineffective assistance of counsel appointed under the qualifying procedures. 28 U.S.C. § 2261(e). Second, relying on the thoroughness mandated at the state level by the qualifying procedures, Chapter 154 modifies prisoner's *federal* habeas rights to provide an expedited review process.[5] Finally, and most importantly for Troy Ashmus, AEDPA provides that "Chapter 154 ... shall apply to cases pending on or after the date of enactment of this Act." 104 Pub.L. 132, 110 Stat. 1226, Section 107(c). The Supreme Court has recently suggested

---

5. *See* 28 U.S.C. § 2263 (six month period to file for federal habeas relief after final state affirmance of conviction and sentence of death on direct review); § 2264 (limiting federal review to claims raised and decided on the merits in state courts unless narrow exceptions apply; incorporating new standards of proof favorable to state set forth in section 2254(d)); § 2266(a) (federal courts shall give priority to applications for relief under Chapter 154); § 2266(b) (district court must render final judgment within six months of application; no delay allowed due to congestion of court calendar; right to amend application limited); § 2266(c) (court of appeals must render final judgment within 4 months of briefing; en banc rehearing to be granted or denied within 30 days after petition for rehearing or receipt of responsive briefing; en banc ruling to follow within 4 months of the order granting rehearing).

that this provision gives Chapter 154 retroactive effect. *Lindh,* 117 S.Ct. at 2064 ("chapter 154 applies to pending cases when its terms fit those cases at the particular procedural points they have reached").

■ The right of any given state to enforce the expediting provisions of Chapter 154 is therefore contingent on finding that the state has met its obligation to provide a comprehensive mechanism for competent representation of indigent capital prisoners. Congress intended the federal judiciary to assess whether a state has met this obligation. *See Ashmus,* 935 F.Supp. at 1057 n. 8 (Although states should be given "wide latitude" to establish a mechanism that complies, " '[t]he final judgment as to the adequacy of any system for the appointment of counsel ... rests ultimately with the federal judiciary.' ") (quoting 1991 Analysis, 137 Cong. Rec. S3220, S3242). As courts have uniformly held, Chapter 154 explicitly contemplates a quid pro quo relationship. *See Lindh,* 117 S.Ct. at 2063 (AEDPA "creates an entirely new chapter 154 with special rules favorable to the state party, but applicable *only if* the State meets certain conditions") (emphasis added); *Bennett v. Angelone,* 92 F.3d 1336, 1342 (4th Cir.) (holding that "the Act establishes a quid pro quo relationship: A state seeking greater federal deference to its habeas decisions in capital cases must, by appointing competent counsel to represent indigent petitioners, further ensure that its own habeas proceedings are meaningful"), *cert. denied,* — U.S. ——, 117 S.Ct. 503, 136 L.Ed.2d 395 (1996).[6] Unless a state affirmatively establishes that each condition described in Chapter 154 has been met, it may not claim the chapter's benefits. *See id.* This is the price of stronger finality rules and greater deference to state habeas proceedings.

As the Powell Committee Report made clear, the logic of this structure is straightforward. The states' legitimate interests in finality, comity and enforcement of its criminal laws [7] must be balanced against both the importance of the "Great Writ" [8] and the essential role of competent representation in ensuring due process and protecting the constitutional rights of capital defendants:

> The relatively small number of executions, as well as the delay in cases where an execution has occurred, makes clear that *the present system of collateral review operates to frustrate the law of 37 states.* The collateral review process tends to be erratic and frequently is repetitious.... This Committee believes that any serious reform proposal must address the problems of delay and repetitive litigation.

> A second serious problem with the current system is the pressing need for qualified counsel to represent inmates in collateral review.... [T]he lack of adequate counsel causes severe problems.... In sum, the Committee believes that *provision of competent counsel for prisoners under capital sentence throughout both state and federal collateral review is crucial to ensuring fairness and protecting the constitutional rights of capital litigants.*

135 Cong. Rec. S13482 (emphasis added). The Powell Committee Report framed its proposal as an effort to strike a proper balance of these interests by making a state's use of Chapter 154 voluntary, but contingent on meeting capital defendants' needs for adequate representation:

> The Committee's proposal is aimed at achieving this goal: Capital cases should be subject to one complete and fair course of collateral review in the state and federal

---

**6.** *Accord: Weeks v. Angelone,* 4 F.Supp.2d 497, 506 (E.D.Va.1998); *Moseley v. Freeman,* 977 F.Supp. 733, 737 n. 9 (M.D.N.C.1997); *Mills v. Anderson,* 961 F.Supp. 198, 200 (S.D.Ohio 1997); *Breard v. Netherland,* 949 F.Supp. 1255, 1261 (E.D.Va.1996); *Hamblin v. Anderson,* 947 F.Supp. 1179, 1180 (N.D.Ohio 1996); *Wright v. Angelone,* 944 F.Supp. 460, 463 (E.D.Va.1996); *Hill v. Butterworth,* 941 F.Supp. 1129, 1134 n. 3 (N.D.Fla.1996), *remanded,* 133 F.3d 783 (11th Cir.1997), *rev'd for lack of case or controversy,* 147 F.3d 1333 (1998); *Ashmus,* 935 F.Supp. at 1056.

**7.** On the states' interests see *In re Clark,* 5 Cal.4th 750, 764 and 776, 21 Cal.Rptr.2d 509, 855 P.2d 729 (1993).

**8.** *See, e.g., Lonchar v. Thomas,* 517 U.S. 314, 324, 116 S.Ct. 1293, 1299, 134 L.Ed.2d 440 (1996) (the writ protects "an important interest in human liberty"); *In re Clark,* 5 Cal.4th at 763–64, 21 Cal.Rptr.2d 509, 855 P.2d 729.

system ... with the assistance of competent counsel for the defendant. When this review has concluded, litigation should end. The proposal allows a State to bring capital litigation by its prisoners within the new statute by providing competent counsel for inmates on state collateral review. Participation in the proposal is thus optional with the States. Because it is optional, the proposal should cause minimal intrusion on state prerogatives. But for States that are concerned with delay in capital litigation, it is hoped that the procedural mechanisms we recommend will furnish an incentive to provide the counsel that are needed for fairness.

*Id.* at S13482–S13483; *see also* House Committee on the Judiciary, Effective Death Penalty Act of 1995, H.R.Rep. No. 23, 104th Cong., 1st Sess., at 10 (1995) (House Report Accompanying AEDPA) ("In essence the Powell Committee proposal addresses [the problem of an endless habeas review process] through a quid pro quo arrangement under which states are accorded stronger finality rules on federal habeas review in return for strengthening the right to counsel for indigent capital defendants."). The conditional language in sections 2261 and 2265 (i.e., that Chapter 154 shall apply *if* qualifying mechanisms are established) reflects an explicit incorporation of the quid pro quo arrangement envisioned by the Powell Committee.

## C. The Date for Assessing Compliance With Chapter 154

Where, as here, a state wishes not merely to invoke Chapter 154 prospectively, but rather to reach back and apply Chapter 154 to a pending case, the Court faces the difficult task of determining when to assess whether the state had qualifying procedures in place. By permitting states to apply chapter 154 to pending cases Congress clearly contemplated the possibility that some states would already have qualifying procedures in place. *But see Scott v. Anderson,* 958 F.Supp. 330, 332 (N.D.Ohio 1997) (holding that explicit and detailed language chosen by Congress for qualifying procedures must be strictly followed; denying attempt to opt-in even though state's system for appointment and training of counsel was "one of the most careful and comprehensive systems in the country ... [which] undoubtedly Congress had in mind ... when it envisioned the concept of 'opt-in' states."); *Hill,* 941 F.Supp. at 1134 ("Congress ... did not intend that the new habeas provisions would necessarily apply to every state, but only those states that 'opt-in' to the Act by meeting certain preconditions."). Moreover, states laboring under the burden of excessive, repetitive or protracted habeas litigation obviously have an interest in contending that they have provided qualifying procedures as far back as possible in order to apply Chapter 154 to as many pending cases as possible. Nevertheless, Congress also clearly mandated compliance with the quid pro quo arrangement—no state is entitled to the benefits of Chapter 154 unless the qualifying procedures are "established." This reflects the simple judgment by Congress, well documented in the legislative history, that greater deference to state proceedings is only appropriate after states have genuinely provided a mechanism that assures competent counsel to petitioners whose federal habeas rights would be restricted.[9]

9. In *Lindh,* the Supreme Court recognized but did not resolve the thicket regarding Chapter 154's retroactivity and temporal reach. On the one hand, the Court relied on Chapter 154's express statement of application to cases pending at enactment in order to conclude that Chapter 153, which contains no such statement, is not retroactive. 117 S.Ct. at 2063. On the other hand, the Court recognized that determining whether a state is entitled to assert Chapter 154 in specific cases pending at enactment "may well [raise] difficult issues" requiring application of "*Landgraf*'s default rule." *Id.* at 2064. In a footnote, the Court also suggested that, on its face, Chapter 154 lacks the kind of clear, unambiguous statement traditionally required to permit retroactive effect. *Id.* at n. 4. Although the parties have not directly raised this issue, the Court notes that application of Chapter 154's expedited review procedures in a unitary review state to capital defendants such as petitioner raises many of the traditional concerns associated with retrospective legislation. *See, e.g., Landgraf v. USI Film Products,* 511 U.S. 244, 265–268, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (noting that "statutory retroactivity has long been disfavored" and discussing traditional concerns such as "elementary considerations of fairness," "sweep[ing] away settled expectations suddenly and without individualized consideration," the possibility of "us[ing] retroactive legislation as a means of retribution against unpopular groups or individuals," and the Due Process

■■ Thus in determining whether California has "established" qualifying procedures, the Court must carefully examine whether the quid pro quo has truly been met or whether the state is overreaching. The Court believes that in order to apply Chapter 154's expedited review provisions retroactively, California must show that qualifying procedures were in place when the capital defendant would have been entitled to the benefits prescribed by these procedures. *See* Powell Committee Report, Comment, 135 Cong. Rec. S13483 ("[T]o avail itself of [Chapter 154's] more structured habeas corpus review procedures, a State would have to establish a system for the appointment and compensation of competent counsel throughout *all stages* of state post conviction review. The purpose of this mechanism is to assure that collateral review will be fair, thorough, and the product of capable and committed advocacy.") (emphasis added).[10] In a unitary review state such as California, the qualifying procedures should be present from the date appellate counsel is appointed. It is during this time that a petitioner should legitimately expect and receive the benefits of a state's mechanism for providing adequate counsel (e.g., offer of counsel, appointment according to standards of competence provided by rule of court or statute, reasonable compensation, and payment for reasonable litigation expenses). Any other rule does violence to the concept of a quid pro quo relationship.

Courts considering when to assess a state's qualifying procedures in the post-conviction context under section 2261 have noted the same concerns and taken comparable positions. In *Wright*, for instance, the court reasoned:

> Surely Congress did not intend for a state to reap the benefits of the statute unless the petitioner whose case would be subject to the expedited review also enjoyed the "quid pro quo benefits" of the state's enhanced right to counsel provisions during the post-conviction review process.

> Whether a state's system satisfies the requirements of [Chapter 154] should be determined by examining the system as it existed at the time a petitioner first received appointment of counsel in the post-conviction process. It is at this time that a petitioner is first subject to the state's procedures, and would therefore be entitled to enjoy the protections of the state' system.

944 F.Supp. at 463 (rejecting claim that current system should be examined to determine whether state qualifies to opt in) (citing *Ashmus*, 935 F.Supp. at 1057); *see also Weeks*, 4 F.Supp.2d at 506 n. 6; *cf., Bennett*, 92 F.3d at 1342 (state's mechanism could not qualify state to opt in where mechanism was not established until after state habeas petition had been finally denied); *Satcher v. Netherland*, 944 F.Supp. 1222, 1243 (E.D.Va. 1996) (state could not opt-in where system in effect when habeas petition was finally denied was deficient), *rev'd on other grounds and aff'd*, 126 F.3d 561 (4th Cir.1997), *cert. denied, Satcher v.. Pruett,* —— U.S. ——, 118 S.Ct. 595, 139 L.Ed.2d 431 (1997).

■■ A number of other consequences follow from the quid pro quo relationship. First, as the party seeking to obtain the

---

Clause, which "protects the interests in fair notice and repose that may be compromised by retrospective legislation").

Despite the ambiguity in *Lindh,* this Court will follow the Supreme Court's holding that "in determining a statute's temporal reach ... normal rules of construction apply." 117 S.Ct. at 2063. Thus, mindful of the concerns that retrospective application raises, the Court examines the retrospective temporal reach of Chapter 154 by looking first to the quid pro quo structure established by Congress. Where the quid pro quo is not met, Chapter 154 shall not apply.

10. Although this quote refers to post conviction procedures because unitary review was not then part of the habeas reform legislation, there is no reason to assume that Congress intended anything different in the unitary review context. Unless a state provides a system for appointment and compensation of competent counsel "throughout all stages" of unitary review, it may not assert Chapter 154. *See* 1991 Analysis, 137 Cong. Rec. S3221 (under a unitary review procedure "the defense is authorized to raise 'off the record' claims—as well as the normal claims cognizable on appeal—*at the initial stage of review beyond the trial* ") (emphasis added); *id.* at S3222 ("a qualifying unitary review procedure would have to include appointment of counsel for indigents *following trial* for purposes of unitary review.... [N]ew counsel would have to be appointed at the start of the unitary review process ...." ) (emphasis added).

benefit of Chapter 154's expedited review provisions, the burden is properly placed on the state to demonstrate that all of the qualifying procedures have been established. As the Powell Committee Report commented, it is entirely the states' decision whether to opt-in—by so choosing the states are properly allocated the burden of proving compliance. Second, as courts have confirmed, the language of the qualifying procedures and the quid pro quo structure of Chapter 154 demand strict rather than substantial compliance with all preconditions. *See Weeks*, 4 F.Supp.2d at 507 (following rule of strict compliance with requirement for appointment and compensation mechanism); *Mills*, 961 F.Supp. at 201 ("The provisions of § 2261 are drafted with mandatory language and neither substantial compliance nor de facto compliance is sufficient."); *Scott*, 958 F.Supp. at 332 (same); *Breard*, 949 F.Supp. at 1262 (" 'substantial compliance' with the Act's requirements is not sufficient"); *Hamblin*, 947 F.Supp. at 1182 ("Congress did not write Chapter 154 in terms of substantial compliance"); *Wright*, 944 F.Supp. at 464 (same). As one court aptly summed the issue:

> If Congress had intended to afford the States the very significant benefits conferred by Chapter 154 on the basis of a finding of substantial compliance based on past performance, it could have done so. However, it elected not to do so; and instead, Congress chose to confer those benefits *only if the State made an affirmative, institutionalized, formal commitment* to provide a post-conviction review system which Congress considered to be "crucial to ensuring fairness and protecting the constitutional rights of capital litigants." Powell Committee Report at 3240. Where, as here, that commitment has not been made in the manner, and to the extent, prescribed by Congress, the state is not

entitled to the very significant benefits accorded by the Act.

*Satcher*, 944 F.Supp. at 1242 (emphasis added). The *Satcher* court's insistence that a state must establish a system reflecting "an affirmative, institutionalized, formal commitment" to habeas representation resonates not only with the requirement that qualifying procedures be mandatory and carry the force of law,[11] but also with Congress' choice of the word "mechanism" which plainly suggests that qualifying procedures must not suffer from incoherence or incompleteness.[12]

With this statutory and decisional background in mind, the Court now turns to Respondent's claim that California may invoke Chapter 154 against Mr. Ashmus.

## D. California's Unitary Review Mechanisms Are Inadequate

Respondent claims that these proceedings are governed by the provisions of Chapter 154 "[b]ecause the capital review procedures in effect when petitioner's judgment was unanimously affirmed on direct appeal by the California Supreme Court on December 5, 1991, (and indeed, at all times since June 6, 1989) constitute a qualifying mechanism for unitary review within the meaning of 28 U.S.C. § 2261 and § 2265 ...." Resp. Supp. Mem. at 2. Respondent again offers what it has previously referred to as a " 'comprehensive scheme of interlocking, cross-implementive provisions,' " *Ashmus*, 935 F.Supp. at 1056, and argues that this scheme became effective June 6, 1989. The scheme is composed of the following array of legislative and judicial sources:

(1) Cal. Gov't Code § 68511.5 (effective Jan. 1, 1984);

(2) Cal. Rule of Court 76.5 (effective Jan 1, 1985);

---

11. *See Ashmus*, 123 F.3d at 1208 (state does not qualify under Chapter 154 with non-binding competency standards); *Mata v. Johnson*, 99 F.3d 1261, 1267 (5th Cir.1996) (same), *vacated in part on other grounds*, 105 F.3d 209 (1997); *Wright*, 944 F.Supp. at 467 (same); *see also Hamblin*, 947 F.Supp. at 1181–82 (state cannot opt in because appointment mechanism confers discretion to refuse to appoint if state finds no merit in claims).

12. Although a single statute or rule of Court is not required, a *system* must be affirmatively established and readily discernable, especially if it is claimed to arise from multiple pre-existing sources. "Post hoc rationalization" from a set of evolving, non-binding policies and guidelines will not suffice. *Ashmus*, 935 F.Supp. at 1072; *see also Wright*, 944 F.Supp. at 465 (rejecting state's "piecemeal attempt to pull together the various provisions and argue that this collection satisfies the 'mechanism' required by Congress").

(3) Section 20 of the Standards of Judicial Administration Recommended by the Judicial Council (effective Jan. 1, 1985);

(4) Introductory Statement, Cal. Rules of Court (effective Jan. 1, 1992);

(5) Cal.Penal Code § 1241 (enacted 1955);

(6) Cal. Gov't Code § 68070 (effective as amended Oct. 3, 1977);

(7) California Supreme Court Statement of Policies Regarding Cases Arising From Judgment of Death (the "1989 Policies") (adopted and effective June 6, 1989);

(8) California Supreme Court Internal Operating Practices and Procedures ("IOPP"), Sections XIV.A and XV.A (adopted Summer 1985, revised December 1989 and in 1995);

(9) California Supreme Court Payment Guidelines for Appointed Counsel Representing Indigent Criminal Appellants ("Payment Guidelines") (revised Sept. 19, 1990, and Dec. 22, 1993);

(10) California Supreme Court Guidelines for Fixed Fee Appointments, on Optional Basis, to Automatic Appeals and Related Habeas Corpus Proceedings ("Fixed Fee Guidelines") (effective Jan. 1, 1994);

(11) Cal. Rule of Court 76.6 (effective February 27, 1998); and

(12) Cal. Gov't Code § 69650 et seq. (effective Jan. 1, 1998).[13]

Having determined that the quid pro quo must be satisfied by the date counsel for direct appeal is appointed, the Court could conclude its analysis here since respondent concedes (as he must) that no qualifying mechanisms were in place prior to June 1989. See Resp. Supp. Mem. at 2; see also Ainsworth v. Calderon, 138 F.3d 787, 790 (9th Cir.1998) (holding that "California does not meet the conditions requisite for applying the provisions of the Act to" petitioner whose direct appeal concluded in 1988); McDowell v. Calderon, 107 F.3d 1351, 1355 n. 1 (9th Cir.1997) (declining to apply Chapter 154 because state conceded Chapter 154 not applicable prior to 1989 where petitioner's direct appeal concluded in 1988).[14] However, as the following examination of the state's alleged qualifying mechanisms reveals, even

**13.** The Court will not examine the extensive 1998 amendments to the state's alleged qualifying mechanisms in any detail. Whether California currently qualifies to assert Chapter 154 is irrelevant to the question whether it qualifies to assert Chapter 154 against petitioner. If anything, these amendments suggest a recognition of the part of the state that more comprehensive, coherent and mandatory procedures are necessary for California to opt in.

**14.** Respondent argues that these decisions are inapposite since, in both, the petitioner's direct appeal concluded in 1988, a year before the 1989 Policies required appellate counsel to raise habeas claims in their direct appeals. In contrast, Ashmuş' conviction and sentence was not affirmed by the California Supreme Court until December 5, 1991, well after the 1989 Policies allegedly made California a unitary review state. Resp. Rply. Mem. at 4. Respondent then argues that the date Ashmus was appointed counsel is irrelevant. Id. at 4 n. 1 ("Irrespective of when the appointment of Ashmus' state counsel was initially entered, that appointment was extended to collateral representation by state law *during* the pendency of state supreme court review.") (emphasis original). Respondent's effort to distinguish Ainsworth and McDowell does not undermine the Ninth Circuit's conclusion, based on the state's concession, that California had not satisfied its quid pro quo requirements before 1989. The decisions express no opinion on the question when or whether California has since qualified, nor do they hold that the date a conviction and

sentence of death becomes final under direct review is the benchmark for assessing Chapter 154 compliance.

This Court adheres to the rule that the date of state counsel's appointment is the proper benchmark. Perverse results attend any rule with a later benchmark. Under respondent's "date of state affirmance" rule (and assuming that the 1989 Policies actually established a qualifying mechanism), Chapter 154 would apply to petitioner even though for at least half the period between appointment of counsel and affirmance of his conviction his state counsel had no obligation and no funding to pursue collateral claims. Moreover, any counsel appointed for direct review before the 1989 Policies (again, assuming the Policies established a qualifying mechanism), were not appointed by a process that involved any procedures for assessing and ensuring competency in the area of habeas review. Congress could not have intended that providing collateral counsel at some time during the period of direct review was adequate under the unitary review procedures. Instead, capital defendants subject to unitary review procedures must have received competent habeas representation for the length of their direct review in order for the state to fairly assert Chapter 154 and curtail their federal habeas rights. This is the essence of the quid pro quo requirement. Respondent's invitation to bend this requirement in the direction of substantial compliance is not well taken.

if a later date is chosen for measuring compliance with the quid pro quo (e.g., 1991, when petitioner's conviction and sentence received final affirmation at the state level), California does not qualify.[15]

### 1. Does California Authorize Unitary Review?

█ As an initial matter the Court must determine whether the state has created a "unitary review" procedure. *See* 28 U.S.C. § 2265(a) ("[A] 'unitary review' procedure means a state procedure that *authorizes* a person under sentence of death to raise, in the course of direct review of the judgment, such claims as could be raised on collateral attack.") (emphasis added). The Court addressed this question in the class action and answered it in the affirmative. *Ashmus*, 935 F.Supp. at 1069–70 (citing legislative history referring to California as a unitary review state). However, it is worth noting that, prior to the June 6, 1989, California did not authorize unitary review. Until the June 1989 Policies became effective, California did not fund or require appellate counsel to "investigate factual and legal grounds for the filing of a petition for a writ of habeas corpus."[16] 1989 Policies, Timeliness Standards 1–1 to 1–3, Court Rules, Vol.23, pt.3 at 143–46 (West 1996); *see also In re Clark*, 5 Cal.4th at 783–84, 21 Cal.Rptr.2d 509, 855 P.2d 729 ("The Policies ... for the first time, impose[d] an express obligation on counsel representing appellants in capital cases to investigate possible bases for habeas corpus."); *see also* 1991 Analysis, 137 Cong. Rec. at S8717 n. 3 (Remarks of Daniel E. Lungren, Atty. Gen. of California) (citing 1989 Policies for proposition that California has adopted unitary review procedures). Therefore, California did not become a unitary review state until more than two years after the date Ashmus' appellate counsel was appointed.[17]

Respondent dismisses this claim, arguing that, by their terms, the 1989 Policies applied to all pending and previously resolved appeals from judgments of death. *See In re Clark*, 5 Cal.4th at 785, 21 Cal.Rptr.2d 509, 855 P.2d 729. Thus, respondent argues that, as of June 6, 1989, petitioner's appellate counsel was obliged to investigate and pursue collateral claims. Even if this is true, it should not bootstrap the period for assessing the state's compliance from the date counsel was appointed to the date unitary review was authorized. To hold otherwise would subject petitioner to a form of double retroactivity— i.e., because appellate counsel became unitary review counsel, de jure, after June 6, 1989, Chapter 154 applies retroactively not only to all petitioners who received counsel *after* June 1989, but to petitioners like Ashmus whose direct appeals were *pending* as of June 1989.

### 2. Is There a Mechanism for Offer, Appointment, Compensation and Payment of Competent Counsel?

Section 2265(b) mandates a state to offer counsel following trial and section 2265(a) mandates that a state establish, by statute or rule of court, a mechanism for appointment, compensation and reimbursement of reasonable litigation expenses for competent counsel. All state prisoners under capital sentence are entitled to the offer, and all prisoners are entitled to appointment "upon

---

**15.** Other California courts recently considering the issue have reached the same conclusion. *See Montiel v. Calderon*, No. Civ. F–96–5412 OWW (E.D.Cal. Dec. 21, 1998) (Order Regarding Respondent's Motion to Apply Chapter 154 to Pending Death Penalty Cases) (holding that California does not qualify to opt in where petitioner's conviction was affirmed after the 1989 Policies); *Ross v. Calderon*, No. Civ. 96–2720 SVW (C.D.Cal. Dec. 17, 1998) (Order Granting Motion to Dismiss) (same).

**16.** There is some suggestion in *In re Clark* that habeas issues could have been raised by appellate counsel prior to the 1989 Policies. *See id.* at 782, 21 Cal.Rptr.2d 509, 855 P.2d 729. Respon-

dent does not make this argument, however, and the Policies in effect prior to 1989 advocated waiting to raise collateral issues until after the direct appeal. *See also* IOPP XIV.A.4 (stating that the supreme court will appoint an attorney for habeas review *"after* the termination of the party's state appeal") (emphasis added).

**17.** Moreover, respondents concede that, prior to April 24, 1991, the orders of court appointing appellate counsel did not state that the appointment extends to representation in any related habeas proceeding. Decl. of M. Jameson ¶ 4. Thus, before April 1991, appellate counsel had no direct notice of their unitary review authority or obligations.

a finding that the prisoner is indigent and accepted the offer ....” 28 U.S.C. § 2261(c)(1) (incorporated into section 2265(b)). Respondent contends that its qualifying mechanism for appointment, compensation and payment arises from a number of sources.

### a. Offer and Appointment

According to California Supreme Court Internal Operating Practice and Procedure XIV.A, “[i]n criminal matters, upon a verified or certified statement of indigency, the court, acting through the clerks office, will appoint an attorney for a party ... [i]n capital cases” for appeals to the California Supreme Court and the United States Supreme Court, for applications for executive clemency, and for the conduct of sanity hearings. Court Rules, Vol. 23, pt. 3 at 141 (West 1996). After the 1989 Policies, the scope of appointments in capital cases was extended to collateral representation. *Id.* at XIV.D (incorporating the authorization for unitary review from the 1989 Policies). Respondent also offers the declaration of the deputy clerk of the California Supreme Court who claims that (1) “[a]ll capital defendants are offered the opportunity to have counsel appointed to represent them in all litigation before the [California Supreme Court] concerning their judgment of conviction of death,” (2) “[a]ll capital inmates whose judgments ... have been affirmed on or after June 6, 1989, have been determined to be indigent and have qualified for appointment of counsel,” and (3) appointments of counsel are “always made by orders of Court ....” Decl. of M. Jameson, ¶¶ 3–4.[18] According to respondent, these sources satisfy the offer and appointment provisions of Chapter 154. The Court is not persuaded.

In the class action, the Court held that California did not meet Chapter 154’s offer requirement because in many cases it takes years to actually appoint counsel after an offer is accepted. *Ashmus*, 935 F.Supp. at 1074–75. The Court found that there was a backlog of approximately 130 condemned California inmates who had not yet been appointed counsel. *Id.* at 1055 (also noting respondent’s admission that “[e]very inmate who is awaiting appointment of counsel *has* been ‘offered’ counsel and that offer has been accepted; what is pending is the appointment itself” ’) (emphasis original).[19] Section 2261(c), incorporated by § 2265(b), states that a qualifying mechanism “*must* ” appoint counsel “upon a finding that the prisoner is indigent and accepted the offer ....” 28 U.S.C. § 2261(c). Respondent’s principal contention now is that appointment need not be immediate. Admitting that significant delays persist, respondent nevertheless claims that the statute “imposes absolutely no time limit on the appointment of state counsel as a condition of its application ....” Resp. Supp. Mem. at 11. That counsel must be appointed “*upon* a finding” of indigency and acceptance of the offer, respondent insists, “simply does not denote ‘immediacy.’ ” *Id.* at 12.

Respondent’s argument flies in the face of the statute’s plain meaning as well as the legislative history. As respondent openly concedes, “upon” can mean either “on condition of” or “at the time of ... with little or no interval thereafter.” Resp. Supp. Mem. at 12–13 (quoting *Walsh v. Bd. of Admin.*, 4 Cal.App.4th 682, 705, 6 Cal.Rptr.2d 118, 133 (1992)). In the first instance, upon implies no temporal limit; in the second, however, upon means immediately following. The question here is which meaning Congress intended by using upon in section 2261(c). The Court remains confident that it was the latter. First, the legislative history is clear that actual and expeditious appointment was expected: “*At a minimum, the immediate* benefits to defendants would include the requirement that states electing these procedures *actually appoint* counsel for the collateral proceedings ....” 1991 Analysis, 137 Cong. Rec. at S3220 (emphasis added). Second, effective and competent habeas representation is compromised by long delays in

---

**18.** Ms. Jameson does not aver that these offer procedures were in effect in 1987 when petitioner’s appellate counsel was appointed.

**19.** *See also* Resp. Supp. Mem., Attachment D at 6 (noting that “[a]s of October 1, 1996, there were 467 defendants on death row. Of the 284 direct appeals pending in California, there were *146* awaiting appointment of counsel. There are 32 to 36 new judgments of death entered each year and 19 to 26 counsel appointed each year. Thus, each year the number of defendants without counsel grows larger.”) (emphasis added).

the appointment of counsel. All of the familiar problems associated with delay arise (memory fades, the record grows cold, and witnesses become unavailable).[20] Third, under section 2261(c), offer and appointment are mandatory obligations. 28 U.S.C. § 2261(c) (the mechanism "*must* offer counsel ... and *must* provide for the entry of an order by a court of record appointing one or more counsels") (emphasis added). The quid pro quo would be hollow indeed if compliance by the state was satisfied by merely offering and promising to appoint competent counsel with no element of timeliness. As the Ninth Circuit emphasized, no state should be able to avail itself of the six month limitation period in the federal habeas process when it takes years to appoint state counsel. *Ashmus*, 123 F.3d at 1208. To sanction delays in appointment in unitary review states would allow petitioners' habeas claims to grow stale at the state level even as their federal review is curtailed. Therefore, even if appointment need not be instantaneous, Congress clearly intended a requirement of timeliness in using the word "upon" and California's protracted delays clearly fail this requirement.[21] Respondent's contention otherwise is but another attempt to skirt its side of the Chapter 154 bargain.[22]

■ There is another equally fatal defect in California's offer and appointment mecha-

nism. Internal Operating Practice and Procedure XIV (requiring appointment of counsel in capital cases) and the 1989 Policies (imposing unitary review obligations on appellate counsel) are nonbinding procedures. But Chapter 154's offer and appointment provisions demand a mandatory mechanism—no other conclusion can be drawn from language that states "must" offer and appoint counsel through a mechanism established by statute or rule of court. The only appointment "requirement" to which respondent refers is IOPP XIV.A, which merely announces the Supreme Court's *procedure* or *practice* that "upon a verified or certified statement of indigency" the court will appoint an attorney in capital cases.[23] Neither Rule of Court 76.5 (requiring the adoption of "*procedures* for appointment of counsel"), nor Government Code § 68511.5 (requiring the Judicial Council to adopt rules of court "*regulating the selection* of appointed counsel"), raises the status of IOPP XIV.A to a binding requirement that the state appoint counsel to capital defendants.[24] The inadequacy inherent in placing appointment provisions in nonbinding internal operating practices and procedures becomes manifest when considered in conjunction with the delay that attends appointments in California. Capital defendants in California are bereft of any legally enforceable right to appointment of counsel

**20.** *See, e.g.,* Resp. Supp. Mem., Attachment D at 7 (California Appellate Indigent Defense Oversight Advisory Committee admitting that the "growing number of cases without counsel is a matter of serious concern to the court").

**21.** It is worth noting in this regard that section 2261(c) includes only two conditions on appointment—a finding of indigency and acceptance of the offer. Once these conditions are satisfied ("upon" their satisfaction), appointment must follow.

**22.** Respondent insists that by the enactment of AEDPA, "Congress sought to expedite *federal* review of capital cases, not hasten the pace at which capital adjudication proceeds in *state* courts." Resp. Supp. Mem. at 15 (emphasis original). While this may be true as a general matter, it demonstrates respondent's misunderstanding of the quid pro quo upon which expedited federal review is premised. A state may only enforce expedited federal review if its state process meets the qualifying criteria of Chapter 154. Insofar as delay in appointing state counsel impinges upon or prejudices capital defendants'

right to effective, thorough and competent representation at the state level, Congress *was* speaking to the pace of state adjudication.

**23.** Respondent also fails to point to any procedures that require the state to offer counsel or procedures requiring a finding that decisions to reject offers were made with full understanding of the legal consequences. *See* 28 U.S.C. § 2261(c)(2). The fact that, in practice, the state always makes offers is immaterial. *See Mills,* 961 F.Supp. at 201 (favorable practice of state is irrelevant to assessing compliance with Chapter 154); *Scott,* 958 F.Supp. at 332 (same); *Hamblin,* 947 F.Supp. at 1182 (same); *Satcher,* 944 F.Supp. at 1244 (same).

**24.** *See also* Introduction to IOPP, Court Rules, Vol.23, pt.3 at 133 (explicitly distinguishing the IOPP from constitutional, statutory and decisional authorities, including Rules of Court, which are binding; noting that the IOPP are merely "observed by the California Supreme Court in the performance of its duties"; and emphasizing that the IOPP may be unilaterally "amended from time to time, as needed").

for the pursuit of collateral claims, let alone appointment in a timely fashion. Under these circumstances, the Court cannot conclude that California has a qualifying mechanism for offer and appointment of competent state counsel.

### b. Compensation and Payment of Reasonable Litigation Expenses

Respondent claims that the state has a qualifying mechanism for compensation and payment of litigation expenses by pointing to a "statutory assurance [that] is supplemented in capital cases by a comprehensive array of governing standards and guidelines that are, by their express terms, applicable to the tasks and duties associated with collateral representation in particular." Resp. Supp. Mem. at 9. The "statutory assurance" is California Penal Code § 1241, which states that "[i]n any case in which counsel ... has been appointed by the Supreme Court or by a court of appeal to represent a party to any appeal or proceeding, such party shall receive a reasonable sum for compensation and necessary expenses ...." This assurance is "supplemented" by the Payment and Fixed Fee Guidelines, and the 1989 Policies, which set forth counsel's unitary review duties and applicable compensation standards.

■ As the Court held in the class action, however, the 1989 Policies "expressly preclude[ ] compensation for raising certain collateral issues." *Ashmus,* 935 F.Supp. at 1070. According to the 1989 Policies:

> The duty to investigate [grounds for habeas relief] is *limited to* investigating potentially meritorious grounds for relief that have come to counsel's attention in the course of preparing the appeal. It does not impose on counsel an obligation to conduct, nor does it authorize the expenditure of public funds for, an unfocused investigation having as its object uncovering all possible factual bases for a collateral attack on the judgment. Instead, counsel has a duty to investigate potential habeas corpus claims *only if counsel has become aware of information that might reasonably lead to actual facts supporting a*

*claim.* All petitions for writs of habeas corpus should be filed without substantial delay.

> If a petition is filed after substantial delay, the petitioner must demonstrate good cause for the delay.

Court Rules, Vol. 23, pt.3 at 143–44 (Emphasis added). Thus although the 1989 Policies authorize the expenditure of $3,000 for investigation of potential habeas claims "without prior authorization," *no* funds are actually available to investigate (and there is no duty to pursue) habeas claims unless "appellate counsel is aware of facts which may constitute a basis for habeas corpus relief." *In re Clark,* 5 Cal.4th at 783 n. 19, 21 Cal.Rptr.2d 509, 855 P.2d 729. Moreover, funding beyond the initial $3,000 is only available by filing an application "which identifies the specific issues to be explored and the specific facts which suggest that a basis for a potentially meritorious habeas corpus claim exists." *Id.* At the outset of representation, then, appellate counsel has no duty, authority or funding to find out whether habeas claims exist, and unless a factual predicate for such claims is discovered in the course of preparing claims for direct appeal, there remains no duty, authority or funding to investigate.[25]

Respondent claims that the 1989 Policies simply prevent state counsel from incurring expenses for "a mere 'fishing expedition.'" Resp. Supp. Mem. at 10. However, there is a great difference between a fishing expedition, on the one hand, and competently inquiring into the possible existence of habeas claims, on the other. Indeed, the state has a strong interest in funding the latter—otherwise meritorious habeas claims may be not discovered until and unless funding comes from some other source (most frequently the federal habeas review process). Restricting appellate counsel's duty and funding to investigate habeas claims effectively defers adequate investigation until after direct and habeas review at the state level, and unless the state expressly waives the exhaustion requirement, the newly discovered claims must be presented first to the state court. Under

25. For this reason California's mechanism for compensation and payment of habeas counsel is inadequate even if, as respondent claims, the 1989 Policies do not restrict compensation to claims discoverable "within the four corner of the appellate record." *See Ashmus,* 935 F.Supp. at 1071, 123 F.3d at 1208; Resp. Supp. Mem. at 10.

the 1989 Policies, the California Supreme Court must then decide whether the new claims are time barred because filed "after substantial delay." *See In re Clark,* 5 Cal.4th at 782–86, 21 Cal.Rptr.2d 509, 855 P.2d 729. This time consuming process, which begins with fundamentally inadequate habeas funding at the state level, results in precisely the kind of delay and repetitive litigation Congress intended Chapter 154's qualifying procedures to eliminate. Recent California Supreme Court precedent confirms the confusion created by California's mechanism.[26]

The deficiency of California's provisions is brought squarely into relief by comparison to the broader federal standard. Under the federal standard, petitioners are entitled to funding for all "reasonably necessary services." 21 U.S.C. § 848(q)(B). Because Congress chose the words "payment of *reasonable* litigation expenses" in Chapter 154, the federal standard is, by its terms, a much closer fit with the mandate of section 2265(a) than the restrictive language of the 1989 Policies. Although a state may enjoy "wide latitude" in establishing a qualifying mechanism and does not need to meet the federal standard to qualify, the federal standard reflects what Congress likely had in mind, i.e.,

funding for all reasonable expenses. Since it is immonently reasonable—indeed, a requirement of competent habeas representation[27]—to diligently investigate the possible presence of meritorious habeas claims during direct appeal regardless of whether any "triggering facts" initially justify the inquiry, California's mechanism for compensation and payment cannot qualify under Chapter 154.

Respondent's reference to more recent modifications to the state's compensation and payment procedures (e.g., the Payment and Fixed Fee Guidelines) only bolsters the Court's conclusion that California's procedures have been evolving, albeit haltingly, in the direction of the coherence and completeness required to satisfy Chapter 154. But respondent has provided no evidence or argument that the state affirmatively created a coherent *system* for compensation and payment of competent unitary review counsel. The procedures to which respondent points smack more of "post hoc rationalization."[28] *Ashmus,* 935 F.Supp. at 1072. The Court further notes that, as with the state's offer and appointment provisions, California's compensation and payment procedures suffer for lack of any prescriptive force. The policies and guidelines supplementing Penal Code § 1241 are not statutes or rules of court and

**26.** The state supreme court has explicitly held that, in raising a habeas claim, "substantial delay" may be excused if a petitioner shows that in earlier state proceedings (1) he and counsel were unaware of "triggering facts" sufficient to meet the standard set forth in the 1989 Policies, and/or (2) that he was denied funds to investigate the claim. *See In re Gallego,* 18 Cal.4th 825, 77 Cal.Rptr.2d 132, 139, 959 P.2d 290 (1998); *In re Robbins,* 18 Cal.4th 770, 77 Cal.Rptr.2d 153, 160, 959 P.2d 311 (1998). This rule effectively concedes that the 1989 Policies preclude appellate counsel from investing the time and resources to uncover and develop all but the most immediately evident habeas claims. *See Montiel,* No. Civ. 96–5412 OWW at 20–26. For precedent arguing that the 1989 Policies do not create a discernable rule or standard to follow, see *Morales v. Calderon,* 85 F.3d 1387, 1389–92 (9th Cir.1996) (referring to California's standards regarding appellate counsel's duty to investigate habeas claims as "difficult to articulate," providing "no discernible clear rule," and "applied only at random"), *cert. denied, Calderon v. Morales,* —— U.S. ——, 117 S.Ct. 500, 136 L.Ed.2d 391, *quoted in Ashmus,* 935 F.Supp. at 1071; and *In re Gallego,* 77 Cal.Rptr.2d at 144–50, 959 P.2d 290 (Brown, J., dissenting) (referring to California's standards as "applied as a matter of

discretion without regularity," "impossibly amorphous," "nebulous as well as riddled with exceptions"; concluding that "such imprecise, circular, and tautological language does not define a 'clear' rule this court can 'consistently apply' .... Nor does it even provide guidance.").

**27.** As the Court held in the class action, quite apart from compensation and payment, the state's limitations on the duty to investigate habeas claims "create an objectively deficient standard for the performance of counsel appointed to seek collateral relief in satisfaction of Chapter 154's quid pro quo arrangement." *Ashmus,* 935 F.Supp. at 1071 (citing and quoting *Brown v. Vasquez,* 952 F.2d 1164, 1167 (9th Cir.1991) for the proposition that prisoners must be able to " 'assert all possible violations of ... constitutional rights' and thus avoid the risk of defaulting claims that could have reasonably been discovered through diligent investigation.").

**28.** The fact that the state has just this year adopted dramatic revisions to its compensation and payment guidelines corroborates this assessment. *See Montiel,* No. Civ. 96–5412 OWW at 25–26 (detailing changes and concluding that prior guidelines were inadequate).

impose no binding obligation for compensation of competent counsel and payment of reasonable litigation expenses.

### 3. Does California Provide Standards To Ensure Competent Counsel?

■ Section 2265(a) further requires the state to "provide standards of competency for the appointment of ... counsel" by rule of court or statute. Because respondent continues to rely on section 20 of the Standards of Judicial Administration Recommended by the Judicial Council (entitled "Guidelines for Appointment of Counsel in Criminal Appeals"), the Court hereby adopts, and will not rehearse, its analysis of California's competency standards in the class action. *See Ashmus*, 935 F.Supp. at 1072–74. Instead, mindful of its prior analysis, the Court will turn to respondent's new claims as to why section 20 should be construed as a rule of court.[29]

Respondent argues that section 20 is a rule of court for the following reasons: (1) it is published in the appendix of a volume entitled "Court Rules"[30]; (2) in the legislative history of Chapter 154, California's unitary review procedure is referred to as a "rule of its supreme court,"[31] therefore Congress intended standards such as section 20 to fall within the term "rule of court"; (3) California

Government Code § 68070 authorizes "every court" in the state to "make rules for its own government and the government of its officers not inconsistent with law or with the rules adopted and prescribed by the Judicial Council"; (4) section 20 has been adopted by the Judicial Council and the California Supreme Court; and (5) standards of competency need not be a rule of court or statute so long as they are provided by a rule of court or statute. Resp. Supp. Mem. at 16–18.

■ As an initial matter, the Court notes that at the time section 20's competency standards were established (1985), capital counsel in California had no duty or funding to investigate or pursue habeas claims. Therefore, for all appellate counsel appointed prior to California becoming a unitary review state (i.e., prior to 1989 when the Policies were adopted), there was no evaluation for, let alone assurance of, competency for handling habeas claims. Thus section 20 did not "focus on and articulate standards of competence" for unitary review counsel and there was no mechanism to ensure competency. This alone violates Chapter 154's irreducible minimum. *See* 1991 Analysis, 137 Cong. Rec. at S3220 ("At a minimum, the immediate benefits to defendants would include the re-

---

**29.** In addition to the "rule of court" argument, respondent contends that there is no requirement that competency standards be "inflexibly 'binding or mandatory' " under Chapter 154. Resp. Supp Mem. at 19. The Court simply notes that this argument not only ignores the considered opinion of this Court and the Ninth Circuit, it contradicts the decisions of other courts that have considered the question. *See Mata*, 99 F.3d at 1267 (interpreting section 2261(b) to require "specific, mandatory standards" of competency; rejecting state's attempt to opt in with a procedure for case-by-case evaluation of competency); *Wright*, 944 F.Supp. at 466–67 (holding that a state "cannot satisfy the requirements of [Chapter 154] unless the state imposes binding or mandatory standards of competency" as opposed to mere guidelines) (citing *Ashmus*, 935 F.Supp. at 1072). Given the importance of competent habeas representation, the Court will not deviate from its prior holding in this regard. Mandatory, it should also be noted, does not mean discretionless. It simply means that the competency standards must establish a clear and obligatory baseline of competence. In this sense, the requirement that competency standards be mandatory is but a subset of the requirement that standards be provided by rule of court or statute, i.e.,

provided by procedures which carry the force of law.

**30.** At oral argument respondent brandished the volume with its title "emblazoned" on the spine. *See* Resp. Supp. Mem. at 18. The Court declines respondent's invitation to draw legal conclusions from synecdochical association. To do so would require the Court to ignore explicit language throughout all three volumes of the "Court Rules" which carefully distinguishes rules, on the one hand, from standards, guidelines, policies, recommendations, practices and procedures, on the other. *See* Cal. Rules of Court, Introductory Statement, Court Rules, Vol. 23, pt.1 at 4 (West 1996) (describing standards as precatory and distinguishing them from rules of court which have the force of law); Introduction to Internal Operating Practices & Procedures, Court Rules, Vol. 23, pt.3 at 133 (West 1996) (distinguishing the IOPP from constitutional, statutory and decisional law as well as rules of court); Cal. Const. Article VI, section 6 (distinguishing Judicial Council's authority to "make recommendations" from its authority to "adopt rules").

**31.** 1991 Analysis, 137 Cong. Rec. at S3221.

quirement that states ... *focus on an[d] articulate standards of competence*"), *quoted in Ashmus*, 935 F.Supp. at 1072.

Respondent nevertheless argues that Congress "plainly employed the term 'rule of court' in a distinctly nontechnical sense, and certainly intended that the term would include standards like those specified in section 20 of the Standards of Judicial Administration." Resp. Supp. Mem. at 18. In support of this proposition Respondent cites part of the 1991 Analysis stating that "California, for example, has adopted a unitary review procedure for capital cases *by rule of its supreme court.*" 1991 Analysis, 137 Cong. Rec. S3221 (emphasis added).

▆▆▆▆ Respondent's argument is flawed in a number of respects. First, the reference in the 1991 Analysis is only to California's adoption of a unitary review procedure, it says nothing about competency standards or other qualifying procedures. Second, in the 1991 Analysis Congress merely refers to California as an example of a state with certain unitary review procedures in place. Congress expressed no opinion on the *adequacy* of those procedures, e.g., whether the 1989 Policies are a rule of court within the meaning of § 2265(a). Indeed, after referring to the California example, the same section of the 1991 Analysis emphasizes that the proposed legislation would only "extend[ ] the application of [Chapter 154] to states with *adequate* unitary review procedures in capital cases." 137 Cong. Rec. S3222 (emphasis added).[32] Finally, and perhaps most importantly, the Court needn't scour the legislative record to divine what Congress meant by requiring competency standards to be provided by "rule of court or statute" when the

meaning of those terms is unambiguous. *See Demarest v. Manspeaker*, 498 U.S. 184, 190, 111 S.Ct. 599, 112 L.Ed.2d 608 (1991) ("When we find the terms of a statute unambiguous, judicial inquiry is complete except in rare and exceptional circumstances."). Congress required a statute or rule of court in section 2265(a). California explicitly distinguishes between its rules of court and its guidelines, policies, practices, recommendations, and standards. *See* note 30, *supra*. By its terms then, and by the terms of Chapter 154, section 20 is not a rule of court. Nothing in the legislative record alters this conclusion and respondent's insistence that "rule of court" be read in a "distinctly nontechnical sense" is unavailing.[33]

Respondent next invokes California Government Code § 68070(a) which provides that "[e]very court may make rules for its own government and the government of its officers not inconsistent with law or with the rules adopted and prescribed by the Judicial Council." Cal. Gov't Code § 68070(a). Although respondent does not explicitly so argue, California courts have held that court policies can be enforceable as court rules, under section 68070(a), if the policies are published and if the parties affected are informed that the policies are requirements rather than mere guidelines. *See Shipp v. Superior Court*, 5 Cal.App.4th 147, 151, 6 Cal.Rptr.2d 685 (1992) (holding that a policy manual of procedures for the Family Law Department of the Los Angeles Superior Court is enforceable as a local rule); *City of El Monte v. Takei*, 158 Cal.App.3d 244, 247–48, 204 Cal.Rptr. 559 (1984) (Los Angeles Superior Court Civil Trial Manual is enforceable as general court rule).[34] The line of

**32.** The only source this Court has found for the reference to California as an example of a unitary review state is the remarks of California's Attorney General, Daniel Lungren—a representative of the state with a strong interest in presenting the state's existing procedures as qualifying. *See* 137 Cong. Rec. at S8716 (arguing that California would not seek to opt in "[i]f the provisions of the final legislation are too onerous or are substantively inconsistent with present state law"); *id.* at S8717 n. 3 (citing the 1989 Policies as evidence of California's unitary review procedure). If the state attorney general is the only significant source, any conclusion that Congress believed state supreme court policies or standards could qualify as rules of court within the

meaning of § 2265(a) must be discounted accordingly.

**33.** Even if one withholds inferences as to the reason behind the state's adoption of Rule of Court 76.6 this year, the new rule proves the marked difference between a mere standard recommending criteria for assessing competence and a rule of court setting forth mandatory standards. *See Montiel*, No. Civ. 96–5412 OWW at 15–16 ("If section 20(c) adequately governed capital case competency standards there was no need for Rule 76.6.").

**34.** Both of these decisions rely on the following reasoning from *Wisniewski v. Clary:*

cases creating this rule involve local court policies and the question whether counsel are bound to comply with them as local rules. *See id.* Respondent points to no case holding that section 20 is enforceable under section 68070 and no case holding that an internal standard governing court practices is enforceable *against the state supreme court.* Most compellingly though, there is no evidence that section 20 derives from the state supreme court's power under section 68070. On the contrary, section 20 is set forth in Division I of the Appendix to California Rules of Court, entitled "Standards of Judicial Administration *Recommended by the Judicial Council.*" Rather than assume that the standards set forth in section 20 are what they claim to be—namely, guidelines recommended by the Judicial Council according to its authority under Article VI, section 6, of the California Constitution—respondent would apparently have the Court conclude that section 20 actually derives from section 68070 and thereby has the force of a rule according to cases interpreting that provision for other purposes. The Court is not persuaded.

Even when forced to concede that section 20 is a mere recommendation rather than a statute or rule of court, respondent contends that section 20 is nevertheless a qualifying competency procedure because it has been "adopted" by the Judicial Council and the Supreme Court. Resp. Supp. Mem at 16–17. That the Judicial Council has adopted section 20 proves too much though. In the Introductory Statement to the Rules of Court the Judicial Council does indeed announce that it has adopted all of the "Standards of Judicial Administration." But the Introductory Statement specifically differentiates between rules of court which "have the force of law," and standards such as section 20, which are described as "nonmandatory ... recommendations on practice and procedure [expressing] goals that courts and judges are urged to try to attain, and stat[ing] guidelines for

[I]t seems clear to us that courts which may make local rules may also make local policies—a lower and less permanent form of specification of the practices to be followed in the particular court. So long as those to be governed by the local policies are fully and fairly informed of their requirements in advance and particularly of the fact (*when such is the fact*)

discretionary action." Court Rules, Vol. 23, pt.1 at 4 (West 1996). The Introductory Statement also indicates that the Standards of Judicial Administration are adopted "[u]nder ... 'authority granted by article VI, section 6, of the Constitution to *'make recommendations* to the courts.'" *Id.* The rules of court, by contrast, are adopted under authority granted by the same constitutional provision "*to 'adopt rules* for court administration, practice and procedure not inconsistent with statute' ...." *Id.* Thus, the Judicial Council's adoption of the Standards of Judicial Administration simply confirms that section 20 is not a rule of court.

The only novel support provided for respondent's claim that the Supreme Court has adopted section 20 as a rule of court is evidence that, in practice, the Supreme Court uses section 20 as the "initial measure of the experience and qualifications of private attorneys applying for appointment to a capital appeal." Resp. Supp. Mem. at 16–17 (quoting Appellate Indigent Defense Oversight Adversary Committee, Report on the Efficiency and Effectiveness of the Court Appointed Counsel Program 6 (February 1997); also citing a March 3, 1994 form letter from the California Supreme Court referring to section 20 as "containing the guidelines for the appointment of appellate counsel"). However, the sources cited merely establish that section 20 has been used as a "guideline" since 1994. *See id.* In any event, the state supreme court's reliance on section 20 in practice does not raise section 20 to the status of a qualifying procedure. Courts have regularly held that compliance in practice is not sufficient to meet the requirements of Chapter 154. *See* note 23, *supra.*

 The final new argument raised by respondent is that standards of competency need not actually *be* a rule of court or statute so long as they are *provided by* a rule of court or statute. Respondent claims:

that these policies represent *requirements* rather than mere guidelines, we regard them as being fully enforceable generally as court rules. 46 Cal.App.3d 499, 504–05, 120 Cal.Rptr. 176 (1975) (holding that local policy requiring presence of parties at a mandatory settlement conference is enforceable as a court rule) (emphasis added).

[W]hile section 20 contains the actual *specification* of California's standards, their existence is most certainly "provided" by California Rule of Court 76.5, wherein they are cross-referenced, and California Government Code section 68511.5 (which certainly qualifies as a "statute").

Resp. Supp. Mem. at 17 (emphasis original). This argument flies in the face of the plain language of section 2265(a). In a single, simple sentence the statute commands that "[t]he rule of court or statute must provide standards of competency for the appointment of counsel." 28 U.S.C. § 2265(a). The direct implication is that a state's statute or rule of court setting forth a qualifying mechanism for appointment, compensation and payment would also set forth standards of competence. If the use of singular is ignored ("*The* rule of court or statute"), Chapter 154 arguably permits standards of competence to be set forth in a separate statute or rule of court from other qualifying mechanisms. Either way, the requirement of a procedure established with the force of law is inescapable. Instead of taking the sentence in section 2265(a) for what it means, respondent would have the Court conclude that section 20 qualifies as a rule because Rule 76.5 requires appellate courts to "consider the guidelines in section 20." But a mandate to "consider" nonmandatory recommendations is not a rule of court. It provides no requirement that counsel be appointed according to standards that ensure competent representation.

Under the foregoing circumstances, the Court remains confident that, at least until this year, California had no qualifying mechanism in place for ensuring competent unitary review counsel.

## III. CONCLUSION

Accordingly, and good cause appearing, the Court hereby ORDERS that Chapter 154 SHALL NOT APPLY to these proceedings. **IT IS SO ORDERED.**